Frank **SCOFIELD**, formerly Collector of Internal Revenue, First District of Texas, Appellant,

v.

**LA GLORIA OIL AND GAS COMPANY**, and La Gloria Corporation, a dissolved Texas Corporation, Appellees.

No. 17196.

United States Court of Appeals Fifth Circuit.

June 16, 1959.

Rehearing Denied Oct. 9, 1959.

John R. Brown, Circuit Judge, dissented.

C. Moxley Featherston, Marvin W.. Weinstein, Lee A. Jackson, Dept. of Justice, Washington, D. C., Charles K..

Rice, Asst. Atty. Gen., Russell B. Wine, U. S. Atty., John E. Banks, Asst. U. S. Atty., San Antonio, Tex., for appellant.

Marvin K. Collie, Houston, Tex., Binford Arney, Corpus Christi, Tex., Clyde L. Wilson, Jr., Houston, Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., for appellees.

Before TUTTLE, JONES and BROWN, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal presents the question whether La Gloria Oil and Gas Company is entitled to the statutory depletion allowance of 27½% of its gross profits from the sale of certain heavier hydrocarbons it extracted from wet gas delivered to it for such extraction and recycling by owners of the gas. The answer to this question depends upon whether the complex contractual relations between La Gloria and the owners of the leasehold interests in the gas created in La Gloria an economic interest in the minerals in place, and, if so, whether the entire income from the sale of the heavy hydrocarbons is a part of the production and thus "income from the property" or in part is a result of processing, subsequent to the completion of production.

We decide the first question in the negative, and thus do not reach the second.

The statutory basis for the depletion for the years in question is to be found in Section 23(m) and in Section 114(b) (3) of the Internal Revenue Code of 1939.[1]

The facts giving rise to the litigation here are not in dispute. Although complex, they must be understood precisely before the court can match them with other situations on which the courts have heretofore acted. As here reproduced, the statement is taken largely from the taxpayers' brief. The statement, however, includes some matters which are undisputed, but not included in taxpayers' recitation.

In 1940, certain oil and gas companies and individuals owned interests in undeveloped oil and gas leases in the La Gloria Field area. The La Gloria Field area is a multiple-sand oil and gas field in Jim Wells and Brooks Counties, Texas. This area includes the "La Gloria Unit," the "South La Gloria Unit," and the "Moos Unit." The thirty-five producing zones of this field contain reserves of oil and natural gas; approximately 94% of the natural gas consists of the lighter hydrocarbon compound of methane and approximately 6% thereof consists of heavier hydrocarbon compounds. Each of these hydrocarbon compounds exists in a natural vapor state in high pressure reservoirs.

Prior to June 4, 1940, (the date of the first contract with which we are here con-

---

1. "§ 23. Deductions from gross income. "In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

"(m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary \* \* \*. In the case of property held in trust the allowable deduction shall be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the instrument creating the trust, or, in the

absence of such provisions, on the basis of the trust income allocable to each." 26 U.S.C. 1952 ed., § 23.

"§ 114. Basis for depreciation and depletion.

\* \* \* \* \* \* \*

"(b) Basis for depletion.—

\* \* \* \* \* \* \*

(3) Percentage depletion for oil and gas wells. "In the case of oil and gas wells the allowance for depletion under section 23(m) shall be 27½ per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property \* \* \*." 26 U.S.C. 1952 ed., § 114.

cerned) five exploratory wells had been drilled in the field of Magnolia, et al., and established the existence of the hydrocarbon compounds in some of the reservoirs underlying a portion of certain leases. There existed the contingent possibility that the drilling of a number of additional wells would develop substantial reserves of additional hydrocarbon compounds.

Insofar as the La Gloria Field was concerned, there existed no available substantial market for methane, but there did exist available markets for some of the heavier hydrocarbon compounds. Under the conservation laws of Texas, production of natural gas from the La Gloria Field, and the separation therefrom of the heavier hydrocarbon compounds, followed by the flaring of the residue gas (methane) would have constituted physical waste and would not have been permitted. Therefore, the only existing feasible means of producing an economic return from the natural gas reserves was a method of separating the marketable heavier hydrocarbon compounds from the natural gas and then returning the remaining residue to the gas producing formations. The common method of producing and separating such hydrocarbons is cycling, which is the process for producing the maximum quantity of heavy hydrocarbons contained in the high pressure gas in gas reservoirs.

Not only was this production procedure necessary to prevent the waste of the residue gas, but the injection of the residue gas was necessary to maintain pressure in the reservoir. If the reservoir pressure was not maintained by cycling (the only method available), retrograde condensation would occur.

Retrograde condensation is a natural phenomenon that only occurs in high pressure gas reservoirs above a pressure of 1200 pounds.

Through cycling, La Gloria will be able to recover 8,800,000 barrels of heavier hydrocarbons that otherwise would have been lost by retrograde condensation.

Through the medium of an instrument dated June 4, 1940, La Gloria entered into a legal relationship with Magnolia Petroleum Company, et al., the then owners of undeveloped gas leaseholds in the La Gloria Field. The general substance and economic effect of such instrument was as follows:

(1) La Gloria would use its best efforts to unitize the participating area.

(2) Upon obtaining requisite unitization agreement, La Gloria at its expense would construct a cycling plant equipped with necessary appliances, gathering and return lines, with capacity of 150,-000,000 cubic feet of gas per day, designed and constructed to process gas for the recovery of natural gasoline, condensate and other products and to return the residue gas (methane) at high pressure into the producing formations. To the extent of 150,000,000 cubic feet of gas per day the plant was exclusively dedicated to the participating area of Magnolia, et al.

(3) At the time operations were commenced for the construction of the cycling plant, La Gloria at its initial expense, would drill and equip a sufficient number of gas wells (not exceeding 20), the number and location and specifications to be determined by Magnolia, to enable production of 150,000,000 cubic feet of gas per day and input wells for the return of gas to the producing formations. La Gloria was to be repaid for such well costs from Magnolia's share of production.

(4) When the cycling plant was ready for operation, La Gloria agreed to operate the plant, take and process the gas for the recovery of heavier hydrocarbons, and to return the residue gas (methane) into the producing formations through input wells furnished by Magnolia, and to continue such taking and processing and return of residue gas during the life of the agreement with the exception that La Gloria could but was not obligated to take gas having less than specified minimum GPM content. The term of the agreement was for the life of the leases, with La Gloria having the right to sus-

pend operations if production diminished below, and was not thereafter increased to, a designated minimum quantity. Under stated conditions La Gloria could process gas of others not parties to the contract.

(5) In consideration of La Gloria's investment and undertakings it acquired 50% of the heavier hydrocarbons "contained in all gas to be produced from" said leases.

Through the medium of an -instrument dated June 16, 1941, La Gloria entered into a further legal relationship with Magnolia Petroleum Company, et al. (different owners from the first contract), the then owners of other undeveloped gas leaseholds in the South La Gloria Field. Through the medium of an instrument dated May 31, 1943, La Gloria entered into a legal relationship with The Texas Company, et al., the then owners of other undeveloped gas leaseholds in the Moos Unit. The general substance and economic effect of both instruments is similar to that stated with reference to the first instrument, dated June 4, 1940.

La Gloria on October 24, 1940, obtained from the Railroad Commission of Texas a special order permitting recycling (cycling) of gas in the La Gloria Field. The Commission found that "the proposed plan for recycling will not result in physical waste, but will permit the recovery of a greater volume of liquid products."

Pursuant to such legal relationships La Gloria secured execution of unitization agreements, constructed its natural gas cycling plant with requisite processing facilities, compressors, gathering lines, return lines and meter stations, and constructed additions to and expansions of such facilities, caused sixteen gas wells to be drilled and equipped in the field; all of which expenditures aggregated approximately $5,452,000. It was reimbursed from the owners' share of the minerals for the cost of drilling and equipping the wells.

The flow of the gas in the cycling process is summarized as follows: The high pressure gas was produced from the reservoir up through the well bore through the producing well, through the gathering lines into the plant, the heavier hydrocarbons were removed in the plant, the residue gas (methane) coming out of the plant was compressed to a pressure higher than the reservoir pressure, flowed from the compressors back through the return line into the injection well down through the well bore, back into the reservoir, and the dry injected gas displaced and swept the wet gas containing the heavier hydrocarbons in the reservoir toward the producing well.

An accurate but simplified description of the flow of gas and the hydrocarbon compounds in the separation facilities may be summarized as follows: The wet field gas flowed through the coolers, through regulators where a pressure drop was taken, into separators where as a result of change in pressure and temperature a portion of the heavier hydrocarbons fell out as a liquid by gravity and flowed to the raw feed tanks. The gas containing the remainder of the heavier hydrocarbons flowed from the separators into absorbers, and there came into contact with absorption oil; the additional hydrocarbons were scrubbed out of the gas by going into solution with the absorption oil, which may then be designated as rich oil. By application of heat the heavier hydrocarbons were removed from the rich oil and flowed into the raw feed tank; the dry gas or methane flowed out of the absorbers to the compressors.

From the raw feed tank flowed a commingled stream of the heavier hydrocarbons recovered from the separators and in the absorbers; these compounds flowed through fractionators where the commingled stream of heavier hydrocarbon compounds were divided into respective separate compounds. The heavier hydrocarbons existed in a vaporous phase in the reservoir and were in a liquid phase as recovered in the plant

with no chemical change in the composition of the respective heavier hydrocarbons as they existed in the reservoir and as they existed after recovery in the plant.

In addition to the foregoing facts it is undisputed that La Gloria obtained a contractor to drill the wells by the assignment of such part of its right to repayment for costs by Magnolia as necessary for this purpose; it obtained the necessary equipment to equip the wells by a similar assignment to an equipment supplier, to which, however, La Gloria also pledged its credit; it obtained the necessary financing for the drilling and equipment of the wells by pledging a share of its interests to a bank. It lost the differential between 4%, which it received by way of recoupment, and 6% interest it paid to the equipment dealer for a part of the period.

As to its income tax return for the years 1947 through 1951, La Gloria's deductions of 27½% depletion from its income from sale of its 50% interest in the heavier hydrocarbons it extracted and sold were disallowed by the Commissioner. The taxpayer paid the tax and sued in the district court for refund.

Upon a finding of the facts substantially as set out above, the trial court concluded that the taxpayer was entitled to the depletion allowance on its entire income from the sale of heavier hydrocarbons.

The court made no findings on the point, but it was undisputed that some twenty per cent. of the total sales by La Gloria (these were not included in those as to which depletion was claimed) were of heavier hydrocarbons of identical kinds from gas furnished to La Gloria by others than the three production units mentioned and processed by it for such owners.

In its findings of fact the trial court [171 F.Supp. 624] stated that the construction costs of the plant and gathering pipe lines and metering stations constituted "a capital investment in the liquid hydrocarbons." The court then made a finding of facts as follows:

"The only source that La Gloria had to recoup its capital investment, described above, was from its share of the hydrocarbons produced and La Gloria was dependent solely upon the production of such hydrocarbons from the realization of its interests in the hydrocarbons in place."

Before further discussion of the case, it must be pointed out, because it goes to one of the essential tests of depletability of income, that if this finding means that "the only source that La Gloria had to recoup its capital investment * * * was from its share of the hydrocarbons produced *from the units*" then it is demonstrably in error. As we have stated, twenty per cent. of the gross income from the La Gloria plant comes from the extraction and sale of hydrocarbons from gas entirely unrelated to these three units. Obviously, therefore, the value of the capital investment in the plant would be recouped from the outside sources as well as from the three units here involved. If, on the other hand, the trial court did not mean his finding to say that the source of recoupment was from the hydrocarbons produced by the three units, then the finding is of no legal significance, as will be developed later.

■ Both parties agree that the origin of the formula by which the courts determined whether income is subject to the percentage depletion deduction in the oil and gas industry is the Supreme Court's opinion in Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489. There the taxpayer, a lessee of certain oil and gas properties, had transferred his interest in these properties to two oil companies in return for a cash bonus, a future payment to be made "out of one-half of the first oil produced and saved," and an additional royalty of one-eighth of the oil produced and saved. In upholding the taxpayer's right to depletion on all three types of payments, the court based its decision on the grounds that a taxpayer is entitled to depletion where he

has (1) "acquired, by investment, any interest in the oil in place," and (2) "[secured] by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." 287 U.S. 551, 557, 53 S.Ct. 225.

Both parties also agree that the last word on this complex subject is that spoken by the Supreme Court in the recent case of Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 398, 100 L.Ed. 347. In that case, two taxpayers were in dispute as to which was entitled to the depletion. Southwest had acquired from the State of California, by bid, leases on certain offshore oil deposits. It was a condition of the lease that all drilling must be done from the shore instead of vertically over the deposits. As a condition to the lease Southwest was required to show, as it did, an effective agreement permitting the drilling of the wells from the surface of upland owners. These owners, Huntington Beach Company, et al., had executed such agreement, including the right of ingress and egress and the usual provisions for use of the surface as needed, and in return Southwest contracted to pay Huntington 24½% of its net profits from the oil deposits. Both Huntington and Southwest claimed the right to depletion as to this 24½% of the income.

The Supreme Court held that Huntington, the upland owner, was entitled to the allowance. The Court briefly traced the history of its decisions in this area and, after quoting the formula from Palmer v. Bender, set out above, commented:

"These two factors, usually considered together, constitute the requirement of 'an economic interest.' This Court has found the requisite interest in the oil in place to have been retained by the assignor of an oil lease, Thomas v. Perkins, 301 U. S. 655, 57 S.Ct. 911, 81 L.Ed. 1324, * * * and the grantor of oil lands considered as an assignor of drilling rights, Burton-Sutton Oil Co.

v. Commissioner, 328 U.S. 25, 66 S. Ct. 861, 90 L.Ed. 1062. The Court found no such interest in the case of a processor of natural gas who had only contracted to buy gas after extraction, Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897, and in the case of a former stockholder who had traded his shares in a corporation which owned oil leases for a share of net income from production of the leased wells, Helvering v. O'Donnell, 303 U.S. 370, 58 S.Ct. 619, 82 L.Ed. 903.

"The second factor has been interpreted to mean that the taxpayer must look *solely* to the extraction of oil or gas for a return of his capital, and depletion has been denied where the payments were not dependent on production, Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904, or where payments might have been made from a sale of any part of the fee interest as well as from production. Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277.

It is not seriously disputed here that this requirement has been met. The problem revolves around the requirement of an interest in the oil in place.

"It is to be noted that *in each of the prior cases where the taxpayer has had a sufficient economic interest to entitle him to depletion, he has once had at least a fee or leasehold in the oil-producing properties themselves.* No prior depletion case decided by this Court has presented a situation analogous to that here, where a fee owner of adjoining lands necessary to the extraction of oil is claiming a depletion allowance." (Emphasis added.)

The Court found that Huntington had the requisite economic interest in the oil in place, saying:

" * * * Proximity to the offshore oil deposits and effect of the state law combined to make the up-

land owners essential parties to any drilling operations. This controlling position greatly enhanced the value of their land when extraction of oil from the State's offshore fields became a possibility. The owners might have realized this value by selling their interest for a stated sum and no problem of depletion would have been presented. But instead they chose to contribute the use of their land in return for rental based on a share of net profits. This contribution was an investment in the oil in place sufficient to establish their economic interest. Their income was dependent entirely on production, and the value of their interest decreased with each barrel of oil produced. No more is required by any of the earlier cases."

And finally, in language that is of extreme significance here because La Gloria is a "stranger" "disassociated from the lease," the Court concluded the opinion:

"Southwest contends, finally, that if depletion is allowed to the upland owners in this case, it would be difficult to limit the principle in instances of strangers 'disassociated from the lease' who may have contributed an essential facility to the drilling operation in return for a share of the net profits. But those problems are not before us in this case where the upland owners could hardly be said to be 'disassociated from the lease.' *We decide only that where, in the circumstances of this case, a party essential to the drilling for and extraction of oil has made an indispensable contribution of the use of real property adjacent to the oil deposits* in return for a share in the net profits from the production of oil, that party has an economic interest which entitles him to depletion on the income thus received." (Emphasis added.)

We have quoted so fully from this opinion, partly because it is the last expression of the Court on this very question, but largely also because taxpayer lays heavy stress on it as requiring a decision in its favor.

The Government, not at all disturbed at such reliance by La Gloria, nevertheless stresses Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 618, 82 L.Ed. 897, as setting forth the true principles on which the decision here must depend. In Bankline, the taxpayer, also a stranger to the lease, had contracted, in return for a two-thirds share in the salable gasoline extracted by it from wet gas delivered to its gathering pipes by the producer, to build the necessary plant and facilities that would receive the wet gas and process it in somewhat similar fashion to that used here to extract the heavy hydrocarbons, and sell the gasoline thus extracted for its account and for the account of the producer on the basis of two-thirds and one-third. Some of the residual gas was sold, some was flared and wasted, and some was returned to the wells for pressure purposes.[2] The taxpayer contended that its investment in the expensive plant and network of pipes, both essential to commercial development of the minerals, coupled with its acquisition of a share of the gasoline content of the gas which was the only source from which it could recover its capital investment, qualified it as having an economic

---

2. Taxpayers here belabor the point that the Bankline record is silent as to there being any contractual obligation on the part of Bankline to compress the gas for reintroduction into the reservoir. Since, however, it seems elementary that gas could not be returned to the reservoir to force the continued flow of the wet gas to the surface unless returned under a pressure greater than that present underground, it is clear that at least as to such part of the stream of gas as was processed and returned to the wells, the taxpayers' argument here that its extraction of heavier hydrocarbons was a part of production because the stream is still to be reintroduced into the ground for pressure purposes, would be equally valid in Bankline.

interest in the gas in place. The Court rejected this contention, saying:

> "* * * The phrase 'economic interest' is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one *who has no capital investment in the mineral deposit.* See Thomas v. Perkins, 301 U.S. 655, 661, 57 S.Ct. 911, 913, 81 L.Ed. 1324." (Emphasis added.)

■ The Supreme Court, in Southwest Exploration, did not overrule or in any way criticize or limit its decision in Bankline. It must be taken, then, that the mere fact that a taxpayer makes a large investment in a necessary plant for the sole purpose of extracting hydrocarbons from a stream of gas, part or all of which is thereafter reintroduced in the underground reservoir under pressure, and gets its return exclusively from a share of the hydrocarbons extracted, has not thereby made a "capital investment in the mineral deposit." Conceptually, the La Gloria case is very close to Bankline. Certainly it is much more similar than it is to Southwest Exploration. This is particularly so since the court expressed a clear caveat in Southwest Exploration lest its decision be construed as having application where the taxpayer seeking depletion is a "strangers 'disassociated from the lease.'" [350 U.S. 308, 76 S.Ct. 400.] The fact situation there, which involved an "association" of the closest kind, in that the drilling activities and the mouth of the well were actually located on the taxpayers' lands, cannot be equated to any dissimilar relationship, at least for the purpose of claiming it as a precedent in an entirely different situation. At least, so said the Court itself.

We must now examine carefully to see what significant facts are present here that were not before the Court in Bankline to see whether what is conceptually the same is nevertheless technically and legally different to such degree as to give to this taxpayer this substantial tax advantage.

■ First, taxpayer here makes an effort to say that there was an actual conveyance of the heavier hydrocarbons in place. That and other circumstances distinguish the case of Hudson Engineering Corp. v. Commissioner, 5 Cir., 183 F.2d 180, from Bankline and from this case. The trial court held that the effect of the contracts before us was to effect a conveyance of the hydrocarbons. We cannot agree. Although the "Whereas" clause in the contracts states that the buyers are desirous of purchasing and sellers of selling "the natural gasoline, condensate and other products contained in all gas *in and under and to be produced* from said leases and lands," the granting clause is significantly more restrictive. It granted "all natural gasoline, condensate and other products contained in *all gas to be produced* from his or its lands * * * together with the right to extract such natural gasoline * * * subject to the conditions hereby contained * * *."

One of the further terms of the contract provided that the wells, casing equipment and top well connections, should belong exclusively to Magnolia, the seller, and that seller should at all times have full and complete control of the operation of the wells; that each well should be equipped for delivery of gas into La Gloria's gathering system at outlets designated by seller. Thus La Gloria had no right to enter, drill or take any gas except as delivered to it at the top well connections of the seller. Taxes on the gas in place were to be paid by the seller and not by La Gloria. Finally it was provided: "No deed of trust, mortgage, lien or other encumbrance of any kind or character whatsoever arising out of buyer's operations shall *attach to or affect Seller's oil and gas mining leases or the production therefrom or interest therein* * * *." The contract was also nonassignable by La Gloria, which fact, of course, is inconsistent with the nature of the interest

which the owners of heretofore recognized depletable interests have held.[3] We conclude that there was here no actual conveyance of any of the minerals in place.

Next, taxpayers strongly stress the fact, which is not disputed, that unless some process very like that here provided was utilized, neither the wet gas nor any of its components could, at the time involved, have been marketed because of the regulations of the state regulatory board and because it would have constituted waste. It is contended that the sheer necessity of this operation resulted in its creating in the party furnishing the facility an economic interest in the gas in place. The fault with this argument is that the same was true with respect to the wet gas and the gasoline in the Bankline case. The court there noted that the wet gas was not salable and the only way the gasoline could be made available was by the processing done by Bankline in its expensive plant. This was not considered by the court to give the required characteristic to the contracts there.

Probably the strongest point urged on us by appellee is the significance of the return of the dry gas to the producing reservoir. Here it is undisputed that Magnolia would not have been permitted at the time in question to have opened the gas wells on its leases unless arrangements had been made to compress the gas after the heavier hydrocarbons were removed and pump it back into the reservoir under pressure to force the continued flow of wet gas to the surface. It is thus claimed that production was not complete when the stream of gas entered La Gloria's gathering lines.

The extraction of heavier hydrocarbons both at the separator and at the absorber [4] results from mechanical and heat processes which do not change the chemical structure of the gas. In a sense, therefore, since the gas, after losing some 6% of its content, is then returned to the ground there is production of the heavier hydrocarbons in the plant of the taxpayer. However, the mere fact that La Gloria's extracting processes are necessary to produce the salable heavier hydrocarbons does not of itself make of its investment in the plant it builds for that purpose an investment in the minerals in place.

Moreover, even though we were to find that the circumstances here warranted a finding that La Gloria did make a capital investment in the minerals in place, there is still the insurmountable hurdle to its claim for depletion in the absence of the second factor of the formula: income derived from the extraction of the minerals, to which taxpayer must look *solely* for a return of his capital. Commissioner of Internal Revenue v. Southwest Exploration Co., supra.

A consideration of this factor highlights the significance of the relationship of the taxpayer seeking depletion to the fee or the leasehold. Is or has the taxpayer been in the chain of title, legal or equitable, to the mineral deposits? No case has been found where, as is true here, a taxpayer, by making substantial investment for the purpose of extracting minerals from several different producing properties, each having entirely unrelated reserves, has claimed that his investment in plant constitutes an investment in *any one* property. No case has been found

3. Note what was said by the Court in Southwest Exploration: "It is to be noted that in each of the prior cases where the taxpayer has had a sufficient economic interest to entitle him to depletion, he has once had at least a fee or leasehold in the oil-producing properties themselves." [350 U.S. 308, 76 S.Ct. 399.]

4. La Gloria contended that extraction continued at the fractionator. The parties stipulated that if it is decided that La Gloria is entitled to depletion on that portion of its income from the sale of hydrocarbons recovered in and attributable to the separation and absorption facilities (exclusive of the division of such compounds in the fractionator facilities), then that portion amounts to 86½% of the income. Were we to reach that point, we would hold that all extraction is concluded before the fractionator process and the maximum recovery would be 86½% of the amount in suit.

where an investment *in gross* has been claimed to be an investment in definite *minerals in place*. Even if such could be the case, however, such an investment could not amount to the required "economic interest," because the production from no single mineral deposit could be looked to solely for a return of the capital investment. As contrasted with the sellers under any one of the three contracts here in question whose entire investment in each gas lease becomes entirely worthless upon the extraction of the last cubic foot of gas, La Gloria is "playing the field." It will continue to extract heavier hydrocarbons from South La Gloria field when La Gloria runs dry, and it will continue to extract them from the Moos unit when the others are exhausted; and even more relevant and significant, it has, during the tax years in question and as contemplated in the contracts themselves, obtained 20% of its gross sales proceeds from the extraction of heavier hydrocarbons of others entirely unrelated to these three producing units. Thus, the court's finding [171 F.Supp. 624] that "the only source that La Gloria had to recoup its capital investment, described above, was from its share of the hydrocarbons produced" could not have meant "produced under these contracts or any of them," because that was completely disproved.

■■ Nor will it do to contend that the capital investment that is to be recouped is the minerals deposits themselves, because that would indeed be begging the very question we must decide—was there such investment as to give the taxpayer an economic interest in the minerals? In order to be such the income from the extraction of minerals must be the sole source of repayment of the *capital* invested. Here the taxpayer's brief itself characterizes the investment to be recouped as the millions of dollars spent in the construction of its facilities in this language:

"(1) La Gloria acquired an interest in place by: (a) Investing and

risking millions of dollars in drilling and equipping wells [recouped out of Magnolia's share of production] and building a [sic] cycling plant facilities; * * *

"(2) La Gloria had to look solely to production for a *return of its contribution because it could only recover its value* from the production —when and if it came."

The critical point here is that it did not look solely to the extraction of the minerals from any one property as to which it sought to claim depletion to recover the value of the large investment; it looked to and actually received production from a vast area, including a multiple-sand, oil and gas field containing 35 different producing zones, of which those here involved comprised only three.

Here, for purposes doubtless satisfactory to themselves, the lease owners did not make subleases or grant legal or equitable interests to La Gloria. They carefully delineated La Gloria's rights as entitling it to all the heavier hydrocarbons *to be produced* and as entitling it to take delivery at the well head. La Gloria is therefore a stranger to the fee and the leaseholds. It built a plant essential to the commercial enjoyment of the lease owners of the gas in place, but it did not look to the extraction of minerals from the flow of gas from any single producing property for recoupment of its large investment. Its fortunes did not rise and fall in the same way as did the lease owners when new reservoirs were discovered or when the reservoir ran dry. Conceptually, therefore, it does not fit into the pattern of those as to whom Congress, by an act of grace, Helvering v. Bankline Oil Co., 303 U.S. 362, 367, 58 S.Ct. 616, 82 L.Ed. 897, has permitted the depletion deduction. Logically and traditionally it does not either. No decided case warrants the extension of the "expanding concept" of depletion to such new lengths.[5]

---

5. In a thoughtful and thorough article, "The Economic Interest—An Expanding Concept," Professor Joseph T. Sneed, then of the University of Texas Law

We conclude that the judgment must be reversed and the case remanded for entry of judgment for the Collector.

JOHN R. BROWN, Circuit Judge (dissenting).

The Court, by a begrudging approach out of keeping with the congressional policy on percentage depletion *so* often reaffirmed, and out of harmony with the developmental judicial accommodation of the doctrine to the practical needs and realities of the oil business, not the least of which is Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347, denies the existence of an economic interest in La Gloria on grounds which, to me, are unrealistic, artificial and hypertechnical. In brief, it is because (1) under the contracts involved La Gloria had no legal title as such in the gas in place and is therefore a stranger to the leases; (2) having no legal title it acquired no economic interest as (3) the contribution of its cycling plant facilities was not production or necessary to production; (4) an investment of facilities to extract gas from *several* properties is not an investment in any *one* of them; and (5) it did not look solely to the sale of gas as the source of the return of its "capital," since it looked to (a) all sands and to multiple reservoirs under each contract and (b) subsequent to the contracts, to outside processing for 20 per cent of its dollar volume.

With deference, none withstand analysis in the light of the actualities of this case and the controlling legal principles.

## La Gloria's Technical Title Is Of Little Importance.

Whatever are the uncertainties of the economic interest doctrine sired by Palmer v. Bender, 1933, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489, described variously as the "most ubiquitous concept in the income tax law of mineral interest,"[1] and "mystifying and somewhat illusory,"[2] two things stand out as clear and unwavering guides. First, the Supreme Court throughout many opinions[3]

School, now of the Cornell Law School, says:

"In determining the existence of an interest in the minerals in place three basic ideas are involved, viz. the legal form or nature of the instrument, the degree of substantial ownership of the deposit possessed by the interest holder, and the extent and nature of his contribution to development and operation of the property. A [1] legal property interest in the minerals, lasting for the productive life of the property [absent here] [2] entitling its holder to significant control of the mineral deposit [lacking here] *and* beneficial enjoyment of income therefrom [present here] and [3] acquired as the consequence of a contribution to its development [doubtful in view of the degree of development prior to the contracts and in view of the fact that financing of the wells could be accomplished entirely but for a slight interest differential by a pledge of anticipated income] or operation [lacking here], is plainly an interest in the minerals in place. Drop one of these characteristics and the resolution of the issue is less certain; drop two and serious doubts arise." 35 Texas L.R., 307, 355.

With two of the characteristics lacking and the third in serious doubt it would seem that even under such an Expanding Concept theory La Gloria would not qualify.

1. Sneed, The Economic Interest—An Expanding Concept, 35 Tex.L.Rev. 307–56 at 307 (1956). This traces in elaborate detail the complete historical development of the economic interest doctrine as well as a critical analysis and evaluation of the factors comprising it.

2. Breeding & Burton, Taxation of Oil & Gas Income 28 (1954).

3. Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347; Burton-Sutton Oil Co. v. Commissioner, 1946, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062; Kirby Petroleum Co. v. Commissioner, 1946, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343; Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Helvering v. Mountain Producers Corp., 1938, 303 U.S. 376, 58 S.Ct. 623, 82 L.Ed. 907; Helvering v. Elbe Oil Land Development Co., 1938, 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904; Helvering v. O'Donnell, 1938, 303 U.S. 370, 58 S.Ct. 619, 82 L.Ed. 903; Helver-

dealing with the subject approaches the matter from a practical standpoint since "the tax law deals in economic realities, not legal abstractions, * * *." Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, at page 315, note 3, 76 S.Ct. 395, at page 399, supra.

Second, the matter is not to be judged by the nature of the legal or equitable title under local land or mineral law. Indeed, Palmer v. Bender, 1933, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489, supra, disregarded as wholly irrelevant the nice technical distinctions of Louisiana mineral law which this Court in that and related cases had thought decisive.[4] "Economic interest does not mean title to the oil in place but the possibility of profit from that economic interest dependent solely upon the extraction and sale of the oil." Kirby Petroleum Co. v. Commissioner,[5] 1946, 326 U.S. 599, 604, note 3, 66 S.Ct. 409, 411, 90 L.Ed. 343, supra. "It is the lessor's, lessee's or transferee's 'possibility of profit' from the use of his rights over production, 'dependent solely upon extraction and sale of the oil' which marks an economic interest in the oil."[6]

ing v. Bankline Oil Co., 1938, 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897; Thomas v. Perkins, 1937, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324; Helvering v. Twin Bell Oil Snydicate, 1934, 293 U.S. 312, 55 S.Ct. 174, 79 L.Ed. 383; Herring v. Commissioner, 1934, 293 U.S. 322, 55 S.Ct. 179, 79 L.Ed. 389; Murphy Oil Co. v. Burnet, 1932, 287 U.S. 299, 53 S.Ct. 161, 77 L.Ed. 318; Burnett v. Harmel, 1932, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199; Lynch v. Alworth-Stephens Co., 1925, 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660. The last three cases, though really pre-"economic interest" cases, do deal with the depletion question.

4. In reversing our decision, 5 Cir., 57 F.2d 32, and overruling our previous cases, Waller v. Commissioner, 5 Cir., 1930, 40 F.2d 892; Herold v. Commissioner, 5 Cir., 1930, 42 F.2d 942, the Court said of Louisiana law questions discussed, "We do not think the distinction material. Nothing in [the depletion statute] indicates that its application is to be controlled or varied by any particular characterization by local law of the interests to which it is to be applied. * * * The formal attributes of those instruments or the descriptive terminology which may be applied to them in the local law are both irrelevant. * * * [T]he lessor's right to a depletion allowance does not depend upon his retention of ownership or any other particular form of legal interest in the mineral content of the land. It is enough if by virtue of the leading transaction, he has retained a right to share in the oil produced. If so, he has an economic interest in the oil, in place, which is depleted by production." 287 U.S. at 555–556, 557, 53 S.Ct. at page 226.

5. The Court also stated, "The technical title to the oil in place is not important.

* * * The test of the right to depletion is whether the taxpayer has a capital investment in the oil in place which is necessarily reduced as the oil is extracted." 326 U.S. at page 603, 66 S.Ct. at page 411.

See also Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 32–33, note 3, 66 S.Ct. 861, 866, 90 L.Ed. 1062, supra, "Nor has the title to the oil in place been considered by this Court as decisive of the capital investment of the taxpayer in the oil. Technical title to the property depleted would ordinarily be required for the application of depletion or depreciation. * * * Congress, however, has recognized the peculiar character of the business of extracting natural resources."

In Anderson v. Helvering, 310 U.S. 404, 411–412, note 3, 60 S.Ct. 952, 955, 84 L.Ed. 1277, supra, referring to Thomas v. Perkins, 301 U.S. 655, note 3, 57 S.Ct. 911, 81 L.Ed. 1324, supra, the Court said, "The decision did not turn upon the particular instruments involved, or upon the formalities of the conveyancer's art, but rested upon the practical consequences of the provision for the payments of that type." In rejecting the Government's contention that title was not in the assignors, the Court further said, "The economic consequences of the transaction are not materially affected by the circumstances that the provision for oil payments is not phrased in terms of a reservation * * * in the oil and gas in place." See also Thomas v. Perkins, 301 U.S. 655, 659, note 3, 57 S.Ct. 911, 913, supra, "We need not decide whether technical title to the oil while in the ground was in assignors or in assignee."

6. The Government in published rulings has frequently used such comprehensive language in defining economic interest.

Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 34–35, note 3, 66 S.Ct. 861, 867, 90 L.Ed. 1062 supra.

### La Gloria No Stranger To Mineral Leases Formally or Actually.

Almost in complete disregard of the numerous expressions, discussed above, that the nature of the title to the oil and gas in place is insignificant, the Government and the Court lay great stress on the formalities in these contracts. First, the contract does not convey an interest as such in the gas or the heavier hydrocarbons "in place." Second, the contract describes the relationship as vendor and purchaser with leaseholders described as "Sellers" and Taxpayer as "Buyers." Third, the locating, drilling, equipping and operating of the gas wells and input wells was stated to be under the full and complete control of the leaseholders. Fourth, Taxpayer's liability for the "handling of the gas" was to be from the time received into Taxpayer's gathering system until the residue gas is redelivered to the wellhead of the input well. Fifth, La Gloria could not mortgage the Seller's interests and could not assign the contract to be performed by it.

But any such overemphasis on formalism of the contract disregards the substantial nature of the undertakings assumed by Taxpayer in the contract, all of which required a substantial investment in risk capital and constituted an essential and indispensable contribution to the production of any gas from this field. This is particularly true since "the complexities of oil operations and risks incident to prospecting have led to intricate, multiparty transactions," Commissioner of Internal Revenue v. Southwest Exploration Company, 350 U.S. 308, at page 313, note 3, 76 S.Ct. 395, at page 398, supra. The effort of the parties to wrap this whole thing up in one document ought not, in the face of the multiple-step rule, see e.g., Kanawha Gas & Utilities Co. v. Commissioner, 5 Cir., 1954, 214 F.2d 685; Georgia-Pacific Corporation v. United States, 5 Cir., 1959, 264 F.2d 161, 3 Mertens, Law of Federal Income Taxation § 20.161, put Taxpayer in a worse position than it would have been in had the transaction been in three parts.[7] Whatever the situation as to title, legal or equitable, in the gas in place,[8] the contract imposed definite, im-

"Accordingly, the right to a depletion allowance does not depend upon the nature or character of the legal estate retained or acquired by the parties to an original oil and gas lease or their successors, but depends entirely upon whether any of such parties is entitled to share in the oil and gas produced from the properties. If any of such parties is entitled to a share of the oil and gas, he has the 'economic interest' upon which the Supreme Court bases the right to a depletion allowance." GCM 11822, XII–1 Cum.Bull. 229, 231 (1933). GCM 22730, 1941–1 Cum.Bull. 214, 222, said, "Assurance of a share of production marks ownership of an economic interest in oil and gas in place."

7. In Hudson v. Commissioner, 1949, 11 T.C. 1042, affirmed by us per curiam Hudson Engineering Corp. v. Commissioner, 5 Cir., 1950, 183 F.2d 180, the transaction took the form of three separate documents. (1) A formal conveyance and assignment of a one-half interest in the gas "in place," but which was expressly subject to the specified process-

ing agreement of even date; (2) a processing and recycling agreement which was subject to termination on specified terms; and (3) a unitization agreement amongst owners of the various mineral interests committing the operation of the producing wells to the operators exclusively. We affirmed the Tax Court's allowance of depletion to Hudson, comparable to Taxpayer here, for the stipulated percentage arising from sale of the products of the plant.

The Court brushes off its own binding precedent with the unilluminating statement that the actual conveyance of the heavier hydrocarbons in place "and other circumstances distinguish the" Hudson case.

8. Actually Taxpayer makes a pretty convincing showing on this. One of the inducement clauses of the contract preamble recited, "Whereas, buyers are desirous of purchasing from sellers the natural gasoline, condensate and other products contained *in all gas in and under and to be produced from* said leases * * *, together with the right

mediate substantial and enforceable obligations on both parties. These included a positive undertaking by Taxpayer to provide or pay for producing and input wells, equipment of wells, and pipelines and plant necessary for the installation and operation of the indispensable recycling process.

### What La Gloria Contributed Was Indispensable to Exploration and Production.

Here is the heart of this case. Here is the part which demonstrates that, as did the upland owners in Southwest Exploration, La Gloria made an indispensable contribution to exploration and production without which there would have been neither. The facts, though undisputed, are so important that they bear repeating. This is important because the Court, while faithfully summarizing the facts, obscures their decisive significance by transmuting the legal doctrine of *stare decisis* into an engineering principle like Boyle's or Charles' law and then reasons that we are foreclosed by Helvering v. Bankline Oil Company, 1938, 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897, note 3, supra. This is done though the Court recognizes that it "is not disputed, that unless some process very like that here provided was utilized, neither the wet gas nor any of its components could, at the time involved, have been marketed because of the regulations of the state

regulatory board and because it would have constituted waste." And the Court further states that, "* * * it is undisputed that Magnolia would not have been permitted at the time in question to have opened the gas wells on its leases unless arrangements had been made to compress the gas after the heavier hydrocarbons were removed and pump it back into the reservoir under pressure to force the continued flow of wet gas to the surface." The former is blithely passed over on the basis of Bankline and the latter is dismissed with these words, emphatic in statement but unilluminating in reasoning: "However, the mere fact that La Gloria's extracting processes are necessary to produce the salable heavier hydrocarbons does not of itself make of its investment in the plant it builds for that purpose an investment in the minerals in place."

Thus does it become essential to restate the facts with all of their self-generating vigor.[9]

The nature of the mineral involved is of immediate importance. Depletion sought relates solely to the heavier hydrocarbons,[10] which I shall refer to as HH. These HH compounds exist in the subsurface reservoir in a vapor state and comprise approximately 6% by volume of the gas in each reservoir. The mineral (i.e., gas) not here involved for depletion is the lighter hydrocarbon called the

to process said gas for * * * extraction * * *." (Emphasis supplied.) The first principal contractual undertaking provided that "Sellers hereby * * * grant, bargain and sell unto buyers all natural gasoline, condensate and other products contained in all gas to be produced from [the] lands located in the * * Field * * * together with the right to extract such natural gasoline * *." Article 19 of the contract, "Oil Rights," by a negative express reservation, suggests, *some character* of interest in the heavier hydrocarbons by excluding all others. "No oil or oil rights nor any liquid hydrocarbons or mixtures of liquid hydrocarbons *except* natural gasoline, condensate and other products as herein defined are *conveyed* or *affected* by this contract. * * *." (Emphasis supplied.) It must also be remembered

that while a factor in the economic interest concept is an interest in the gas in place, the conveyance can go too far. Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, note 3, 58 S.Ct. 621, 82 L.Ed. 904, supra. The recoupment of the so-called capital investment must come from gas *extracted* and sold, hence produced, and not merefrom the *sale* of the gas in place. Anderson v. Helvering, 310 U.S. 404, note 3, 60 S.Ct. 952, 84 L.Ed. 1277, supra.

9. Matters appearing within quotation marks are from the stipulation of the parties.

10. These comprise ethanes, propanes, butanes, hexanes, heptanes and heavier compounds. They are defined in the conveyance contracts by the terms "natural gasoline, condensate and other products."

methane. It, too, exists in a natural vapor state in the reservoir, and in the fields in question comprises the remaining 94% by volume.[11]

The La Gloria Field,[12] situated in Jim Wells and Brook County, Texas, has 35 producing zones. The HH compounds exist in a natural vapor state in high pressure reservoirs under pressures in the neighborhood of 3,000 to 4,000 p.s.i. At the time these contracts were made and throughout the years 1940 through 1950, there was, as to the La Gloria Field, "no available substantial markets for the methane" (i.e., the 94%). However, "there did exist available markets for some of the HH compounds."

Two things were required as a practical matter before production could be undertaken to extract the HH compounds. First, it was necessary to determine whether there were sufficient reserves to make the project commercially profitable. Second, and the first turned on this as well, development and production would be dependent upon compliance with Texas oil and gas conservation laws. As to the first, Magnolia Petroleum Company, prior to June 4, 1940, had drilled five exploratory wells establishing the existence of some lighter and HH compounds in some reservoirs. "There then existed the contingent possibility that the drilling of a substantial number of additional wells would develop substantial reserves of * * * lighter and

HH compounds." But these additional exploratory wells to develop additional reserves could not be drilled and brought in as HH producers unless arrangements were made in advance for the repressuring and return of the lighter methane (94%) compounds into the reservoir. This was because "under the conservation laws of Texas," there then being "no available market for the methane" (94%), "the production of gas * * * and the separation therefrom of the HH compounds, followed by the flaring of the residue [methane] gas, * * * would have been deemed to have constituted physical waste[13] and would not have been permitted."

In view of this, the only then existing "feasible means of obtaining an economic return from the natural gas reserves was a method of separating the marketable HH compounds from the natural gas and then returning the remaining residue [methane 94%] compounds to the gas producing formations * * *." These "means involved the establishment of adequate natural gas reserves, the construction and operation of a natural gas processing or separation plant, the construction and operation of gathering lines and return lines, the existence of necessary producing gas wells and input gas wells, and the construction and operation of requisite compressors and other facilities for compressing the residue gas to a pressure in excess of that existing in the gas producing formations."[14]

11. Nor does the case involve minerals generally described as crude oil or "casinghead gas."

12. This area includes the lands within the "La Gloria unit" under contract "A" with Magnolia June 4, 1940, the "South La Gloria unit" under contract "B", June 16, 1941, and the "Moos unit" under contract "C" of May 31, 1943 with the Texas Company.

13. Art. 6008, Tex.Rev.Civ.Stat., states that "production * * * or use of natural gas in such manner * * * as to constitute waste is hereby declared to be unlawful and is prohibited." Waste includes (c) "underground waste or loss however caused," (d) burning, and (k) escape or loss of gas "into the

air before or after such gas has been processed for its gasoline content." See also Art. 6014; Brown, The Law of Oil and Gas Leases §§ 1503–1508 (1958). Responsibility is committed to the Railroad Commission of Texas. See Railroad Commission v. Shell Oil Co., Tex. Civ.App.1941, 154 S.W.2d 507, affirmed 1942, 139 Tex. 66, 161 S.W.2d 1022. Regulation to prevent physical waste by states is not forbidden by the Federal Constitution. Cities Services Gas Co. v. Peerless Oil & Gas Co., 1950, 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190.

14. The stipulation continues: "The operation of these facilities involves producing the heavier hydrocarbon compounds by means of gas wells, gathering the gas

Thus, before the many leasehold owners could determine whether adequate reserves existed more wells had to be drilled. Before more wells could be drilled and brought in, complex and expensive arrangements had to be made to assure recycling of the lighter methane (94%) gas under pressures in excess of 3,000 to 4,000 p.s.i. Not only would flaring of the residue methane (94%) gas itself be waste and thus prohibited, but failure to repressurize the reservoirs would have resulted in retrograde condensation [15] which would itself be a waste under Texas Article 6008, § 3(c), "Underground waste or loss however caused * * *." Indeed so vital to production was the construction and operation of a plant for processing, compressing and repressurizing the reservoir that Taxpayer (not the various leaseholders, mineral lessees) sought and had to obtain a specific permit from the Texas Railroad Commission.[16]

In short, Magnolia and the other mineral leaseholders had the right to drill for and explore the reserves of the field. They did not have a recycling plant with the indispensable compressors, return lines and input wells for the repressurizing of the reservoirs. The cost of such a plan and the drilling of the exploratory wells was known to be an expensive venture. Taxpayer, however, was willing to undertake these expenditures and to supply this plant. The recycling, repressurizing plant supplied by Taxpayer was

through gathering lines to a plant, separating the heavier hydrocarbon compounds therefrom in such plant, compressing the residue gas, and returning the residue gas through return lines to input wells, the injection of such gas through input wells to producing formations, the maintenance of pressure in the reservoir, and the forced flow or migration of heavier hydrocarbon compounds toward the producing wells."

15. Retrograde condensation occurs only in high pressure gas reservoirs above a pressure of 1200–1500 p.s.i. The District Judge's description of this phenomenon is not questioned. "The gas in the La Gloria Field exists in the reservoir under high pressure and high temperature in a single gas phase. If the gas is produced without the return of the residue gas under high pressure, pressure in the reservoir is reduced and a portion of the heavier hydrocarbons is condensed in the reservoir and covers the reservoir sand grains in a liquid form so that such heavier hydrocarbons are not produced with gas otherwise produced and consequently are lost permanently and irretrievably."

16. The Order, dated October 24, 1940, authorized "La Gloria Corporation, to *produce* not in excess of twenty-five (25) percent of the daily open flow potential of the gas wells located in the La Gloria Field, to process this gas for its gasoline content and return the resultant residue to the horizon from which it was produced." (emphasis supplied)

By a further proceeding the Commission, by Order of October 25, 1954, after a hearing reviewing the cycling operations between October 24, 1940 and October 1954, reaffirmed its earlier order of 1940. For further and continued production it expressly required that "no gas will be produced from any gas well completed in the reservoirs * * * unless the gas produced is processed in a plant for the removal of the liquid hydrocarbons and the residue gas remaining after the removal of such liquid hydrocarbons is returned by cycling operations through injection wells to the reservoirs from which produced." It continued, "the volume of residue gas returned to each reservoir shall be a volume equal to the volume produced from such reservoir, less the quantity of gas lost from shrinkage and use for fuel in the operation of the plant." This effectively prohibited any sale of the methane (94%) gas. In that hearing the Commission expressly found "that as much as 5,600,000 additional barrels of liquid hydrocarbons recovered were directly attributable to the cycling operations * * * [and that such] additional liquid production would have otherwise remained unrecovered in the reservoir and lost to beneficial use, [and would have constituted] waste of an irreplaceable natural resource." It also found that another 2,950,000 barrels of condensate would be recovered by future cycling and repressuring. The aggregate of these figures corresponds to the undisputed estimate made by Taxpayer's gas production engineering witnesses that 8,800,000 barrels of liquid heavy hydrocarbons have been produced by cycling which would otherwise have been irretrievably lost.

its indispensable contribution to production.

More important, what Taxpayer did here was *production* in a very real, as well as legal, sense. Unless the residue (methane 94%) gas was returned under pressure, neither Sellers nor Taxpayer could open the gate valve to allow the gas to flow from a single well. Any such effort would have been a violation of Texas law. Even if done or permitted, it would, through retrograde condensation, have resulted in an irretrievable loss of 8,800,000 barrels of liquid hydrocarbons. As to this quantity, recycling was indispensable to its recovery. Only by the recycling plant, compressing of the residue gas to a pressure exceeding reservoir pressure, the return of residue gas under pressure from compressor to input wellhead, and the repressurizing of the reservoirs was production of any of this gas possible.[17]

In view of this, the fact so strongly pressed by the Government and adopted by the Court, that the contract expressly provided that "Seller shall, at all times, have full and complete control of the locating, drilling, equipping, connecting and operating of the wells * * * " does not make Taxpayer's activities any less production. Both Sellers and Taxpayer were engaged in producing. Each made an indispensable contribution.

Like the upland owner in Southwest Exploration, Taxpayer here provided the complex network of pipelines, compressors and recycling plant without which not a cubic centimeter of gas lawfully could have moved from the wellhead. How far beyond the Separator production ceases and manufacturing processing begins is another matter. Up to the Separator, however, it is clear that Taxpayer played a vital role in the production of the gas.

### La Gloria's Contribution Not Only Indispensable For Production But Substantial In Cost.

While, as I discuss later, the so-called "investment" in the economic interest concept is not used in the traditional sense, and the "capital" for the return of which one must look to income derived from extraction and sale of oil is not the amount of money spent to *acquire* the interest, but is rather the interest *acquired by* that expenditure, the facts here demonstrate conclusively that La Gloria made an indispensable contribution for production and that, in turn, involved substantial financial risks, payments and liabilities. And, as of the date of the three contracts in question, the income under which is alone at issue here, the facts show that there was no other source for the return either of the thing purchased by that investment or the investment itself.

---

17. In the discussion above I paraphrased the stipulation which categorically established that the only feasible means for producing HH at the time of these contracts was the process of recycling and repressurizing the reservoirs. This was corroborated by the Government witness, Leeland E. Fisk, Chief Oil and Gas Engineer for the Internal Revenue Service for the Dallas Region, whose pre-eminence is attested by frequent reference in tax literature to the "Fisk formula." See Sneed, note 1, supra, at 344, note 155: McKeon, Tax Phases of Cycling Operations, 4th Annual Institute on Oil and Gas Law, Southwestern Legal Foundation, 281 at 289; Randolph, Problems of the Oil and Gas Industry: Depletion Problems Including Those Arising From the Hudson and Abercrombe Decisions, New York University Ninth Annual Institute on Federal Taxation, 491 at 495. He was consistently emphatic and forthright:

"Q. How could you have produced any of the heavier hydrocarbon compounds from La Gloria field in the year 1947 other than by the process of cycling? A. That was the only process available at that time * * *.

"Q. Well, I couldn't have produced them in the absence of cycling at that date, could I? A. No, somebody had to cycle them.

"Q. Somebody had to cycle at that time? A. Yes.

* * * * *

"Q. You would agree with me, * * * that this cycling * * * produced the additional eight million barrels of hydrocarbons that would have been lost in the reservoir? A. Yes."

In contracts "A" and "B", note 12, supra, it was expressly agreed that a sufficient number of additional production wells (not to exceed 27) to assure production and delivery of 150,000,000 c. f. per day would be drilled. In addition a maximum of 5 input wells were prescribed. Who was to do this and who was to bear the sole expense was positively stated. "At their own cost and expense [Taxpayer] will drill and equip the producing wells and the input wells required herein * * *. At the time the operations for the erection of the gas processing and recycling plant are begun, [Taxpayer] will begin the drilling campaign and will prosecute the drilling of said wells in an energetic manner to the end that the required number of producing wells and input wells will be completed and ready for operation at the time of the completion of said plant." Under no circumstance were Sellers (leaseholders) to be personally liable for this. The sole source for Taxpayer's recoupment of this cost [18] was to be out of the Seller's share of the proceeds of the sale of the plant products (50% or 55% depending upon HH content) and then only to the extent of funds remaining after payment of three classes of priority claims (taxes, royalties, operations). Under the contract Taxpayer had the personal obligation to expend such sums. It was liable for and would bear the consequences of all deficiencies if ultimate production was inadequate or reserves were exhausted. This was implicit in the provision that "no lien of any kind shall be retained or created against Sellers' wells, leases or equipment by virtue of the drilling and equiping of said wells by [Taxpayer]." [19]

The contract also expressly required that Taxpayer construct and install at its own expense the recycling and processing plant with a capacity sufficient to produce and deliver 150,000,000 c. f. per day.[20] The total outlay for the recycling plant, processing plant, and pipelines was in the neighborhood of $4,500,000.[21]

18. During the years 1940–1942 Taxpayer caused 16 gas wells to be drilled on the La Gloria unit and South unit at a cost of approximately $765,000 and equipped at a cost of approximately $348,000.

19. This personal obligation of Taxpayer vis-a-vis Seller was in no way lessened by the fact that, subsequent to contract "A", Taxpayer made a collateral agreement with Gray & Wolfe, drilling contractors, to drill the wells Taxpayer had agreed to drill. The drilling contractors agreed to drill (but not equip) and to accept as payment "Certificates of Indebtedness" payable from the Sellers' portion of the proceeds from which Taxpayer was to be reimbursed for the cost of drilling wells. Failure or inability of Gray & Wolfe to perform would not relieve Taxpayer of its personal obligation to drill and equip the wells. In any case equipment for the wells was covered under a separate contract with Continental Supply Company who agreed to accept the "Certificates of Indebtedness" carrying 4% interest but expressly required that Taxpayer "guarantee and warrant unto Continental that its total account for the equipment for said wells, together with interest thereon at the rate of six per cent (6%) per annum * * * will be paid to Continental * * * within eighteen (18) months * * * and * * * will pay in cash to Continental any portion of the principal and interest remaining unpaid * * *." This was subsequently refinanced by Taxpayer through a loan with the First National Bank of Chicago but Taxpayer bore the difference between the 4% and 6% interest and remained personally liable. As indicated, footnote 18, supra, equipment costs exceeded $300,000.

20. The contract prescribed: "The said plant will be designed and constructed to process gas and return residue gas at a pressure sufficient to inject it into the formation from which it is produced in the gas field covered by the leases herein mentioned; and it shall be equipped with adequate compressors, absorbers, gathering and return lines and all necessary appliances for the recovery of the natural gasoline * * * and, after extracting the natural gasoline and condensate * * * to return the residue gas * * * to a gas-producing formation * * *."

21. During the years 1940–1942 Taxpayer invested approximately $2,364,000 in the

In addition to the known necessity of Taxpayer expending or incurring liabilities for these millions of dollars, other parts of the contract also manifest the establishment of a permanent relation for the economic life of the La Gloria Field. Subject to only a few specified minimum quantities and qualities, the *obligation to deliver and take was reciprocal and absolute.*[22] Save by the use of magic words, e. g., "gas in place," which the Supreme Court holds unnecessary, the parties could not have used better language to describe a permanent relationship having an immediate and direct reference to the gas in place and the right under mineral leases to produce it. "The term of this contract shall be for and during the life of the leases, or any one thereof, or any renewal, modification or extension thereof, upon and covering the lands hereinabove described, or any part thereof. When the plant is *ready for operation, sellers agree to deliver gas as herein provided and, after commencing processing operations [Taxpayer] shall take and process, and shall continue the taking and processing of gas * * * during the life of this contract, * * *."*

### Southwest Exploration Not Bankline Is The Controlling Precedent.

Southwest Exploration is important, *and to me controlling, not only because* it is the most recent oil case, but because the opinion reflects that the Court measures this economic interest entirely in terms of practical consequences. Con-

sidered in the light of realities, it furnishes the guide. Bankline, on the other hand, is one essentially different, the only resemblance being that it involved a gas processor of an entirely different nature. In Southwest Exploration depletion was allowed to one having no title of any kind or character in or to the minerals at any time prior or subsequent to their extraction, who had made no investment of any kind in any such minerals or the lands under which they were and who expressly had no right of control or authority over drilling, equipping or operating the wells for the production of oil. The Government, on the other hand, stresses and the Court adopts Bankline as a case which, both claim, is precisely in point as it involved the processing of wet gas into natural gasoline. Depletion was denied to the operator of the processing plant who purchased the wet gas from producers in the field.

Southwest Exploration owned a leasehold interest under the tidelands of California. Under California law extraction of oil from tideland leases was permitted only from wells drilled on filled lands (of which there was none) or whipstock wells spudded in upon adjacent uplands. Southwest Exploration contracted with the adjacent upland owner for the use of this land for drilling sites. Under the agreement the upland owner was to be paid a percentage of the net profits from the extraction and sale of oil. Both Southwest Exploration and the upland owner claimed, and by separate court proceedings obtained, depletion upon the

recycling plant and another $200,000 in the necessary gathering pipelines, return pressure pipelines and metering stations. In the year 1945 it constructed and paid for additional facilities to the natural gas processing and recycling plant at a cost of approximately $1,800,000.

22. The contract provided that Taxpayers "are given the exclusive right to take gas within the limits of this contract from all formations capable of producing gas in paying quantities * * *. As any one producing formation is exhausted * * * or * * * becomes un-

profitable * * * sellers will * * * recondition the well or wells so as to produce gas from another known formation, to the end that [Taxpayer] may recover the natural gasoline * * * from all the gas that can be produced from each of the formations * * *." Again it was provided "sellers are firmly obligated to deliver to [Taxpayer] * * * 150,000,000 cubic feet of gas each day * * *." The obligation was reciprocal. "To the extent of * * * 150,000,000 cubic feet daily capacity, [Taxpayer's] plant is exclusively dedicated to the Participating Area * * *."

net profit proceeds paid by Southwest Exploration to the upland owner. Commissioner of Internal Revenue v. Southwest Exploration Co., 9 Cir., 1955, 220 F.2d 58; Huntington Beach Co. v. United States, 1955, 132 F.Supp. 718, 132 Ct.Cl. 427. To resolve this intramural conflict, the Court, on certiorari, applying Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, note 3, 55 S.Ct. 174, 79 L.Ed. 383, supra, had to choose between the two. The Supreme Court held that the upland owner had an economic interest upon this income and that Southwest Exploration had no economic interest with respect to these proceeds. This was the Government's contention before the Supreme Court. But in choosing between the two contesting taxpayers, the Court had to analyze and then reject the arguments made by Southwest Exploration which are much like those presented here by the Government.[23] Rejecting altogether lack of title, the right to enter and drill, and the express contractual negation of an interest in the oil in the upland owners, the Court declared, "But the tax law deals in economic realities, not legal abstractions, and upon closer analysis it becomes clear that these factors do not preclude an economic interest in the upland owners." 350 U. S. at page 315, 76 S.Ct. at page 399. These economic realities included the indispensability of the uplands as a drilling site. "Without the prior agreements with the upland owners, Southwest could not even have qualified as a bidder for a state lease. * * * Thus it is seen that the upland owners have played a vital role at each successive stage of the proceedings. Without their participation there could have been no bid, no lease, no wells and no production. * * * The fact is that the drilling arrangement was achieved and oil produced in the only way that it could have been, consistent with state law and the express requirements of the State's lease." 350 U.S. at pages 315–316, 76 S.Ct. at page 399. As the "law of depletion requires an economic rather than a legal interest in the oil in place," the Court found this to be in the upland owners because they had chosen "to contribute the use of their land in return for rental based on a share of net profits. This contribution was an investment in the oil in place sufficient to establish their economic interest. Their income was dependent entirely on production, and the value of their interest decreased with each barrel of oil produced. No more is required by any of the earlier cases." 350 U.S. at page 316, 76 S.Ct. at page 400. As the upland owner was "a party essential to the drilling for and extraction of oil [who] has made an indispensable contribution of the use of real property adjacent to the oil deposits" the Court likewise rejected Southwest's argument that the upland owners were "disassociated from the lease." 350 U.S. at page 317, 76 S.Ct. at page 400.

As the Court referred specifically to Bankline as a case in which "The Court found no such interest in the case of a processor of natural gas who had only contracted to buy gas after extraction * * *," 350 U.S. at page 314, 76 S.Ct. at page 399, it is evident that the Court considers that there is no conflict in the principles set forth in both opinions.

In Bankline taxpayer operated a casinghead gasoline plant and entered into contracts with oil producers for the treatment of wet gas by the extraction therefrom of gasoline. The taxpayer

---

23. The Court summarized Southwest's arguments as follows: "Southwest contends that there can be no economic interest separate from the right to enter and drill for oil on the land itself. Since the upland owners did not themselves have the right to drill for offshore oil, it is argued that respondent—who has the sole right to drill—has the sole economic interest. It is true that the exclusive right to drill was granted to Southwest, and it is also true that the agreements expressly create no interest in the oil in the upland owners. But the tax law deals in economic realities, not legal abstractions, and upon closer analysis it becomes clear that these factors do not preclude an economic interest in the upland owners." 350 U.S. at page 315, 76 S.Ct. at page 399.

contracted to install and maintain gathering lines from casingheads at the mouth of the wells to its plant. After extraction and sale the producer was to be paid one-third of the total gross proceeds. In some contracts there was an outright "purchase" from the producer, the taxpayer paying one-third of the proceeds received on the sale of the gasoline. Some of the dry gas remaining after removal of the gasoline was blown to the air and wasted as there was no market for it, some was sold, and some was returned to the wells to be used for pressure purposes. The taxpayer was not and did not claim to be a producer or one engaged in production.[24] After stating the Government's contention [25] the Court states positively that taxpayer's activities were not production. "Respondent is a processor. It was not engaged in production."[26] 303 U.S. at page 367, 58 S.Ct. at page 618.

If we bear in mind the legal principles discussed in the light of the technical

restrictions imposed on production of HH from high pressure reservoirs under mandatory conservation laws of Texas, the extensive investment made by Taxpayer, and the absolute absence of any source save extracted gas for recoupment of capital expenditures, it is plain that Taxpayer has the requisite economic interest in its share of the recovered HH.

The distinction between this case and Bankline is patent and vital.[27] There the Court expressly found that the operator "was not engaged in production" and was but "a processor." 303 U.S. 362, at page 367, 58 S.Ct. 616, at page 618. Both the Court and Tax Court emphasized that the operator "did not produce [the gas] and could not compel its production * * * [and it] had no enforceable rights * * * prior to the time the wet gas was actually placed in its pipeline, * * *." 303 U.S. 362, at page 368, 58 S.Ct. 616, at page 618.

24. The Court summarized taxpayer's description of its function. "Respondent states that in accordance with the provisions of the contracts it attached pipelines to the various wells, carried the gas from those wells to its plant, where the gas from the wells of the different *producers* was commingled, and removed the gasoline therefrom." (Emphasis supplied.) 303 U.S. at page 366, 58 S. Ct. at page 617.

25. "The Government maintains that under the contracts respondent took no part in the production of the wet gas, conducted no drilling operations upon any of the producing premises, did not pump oil or gas from the wells, and had no interest as lessor or lessee, or as sublessor or sublessee, in any of the producing wells." 303 U.S. at page 365, 58 S.Ct. at page 617.

26. The Court then went on to say: "Under its contracts with producers, respondent was entitled to a delivery of the gas produced at the wells, and to extract gasoline therefrom, and was bound to pay to the producers the stipulated amounts. * * * In *either case* the gas was to be delivered to respondent at the casingheads or gas traps installed by the producer. Respondent had the right to have the gas delivered, but did

not produce it and could not compel its production. The pipe lines and equipment, which respondent provided, facilitated the delivery of the gas produced but the agreement for their installation granted no interest in the gas in place. * * * Respondent was still a processor, paying for what it received at the well's mouth. As the Board of Tax Appeals said * * * : 'It is safe to say, we believe, that this petitioner [respondent] had no enforceable rights whatsoever under its contracts prior to the time the wet gas was actually placed in its pipe line, i. e., after it had passed beyond the casingheads and gas traps supplied by the producer into the pipe line, except the right, perhaps, to demand that the producer deliver whatever was produced through its pipe lines for treatment during the period of contractual relationship.'" 303 U.S. at pages 367–368, 58 S.Ct. at page 618.

27. An authority cited by the Government, McKeon, Tax Phases of Cycling Operations, Fourth Annual Institute on Oil and Gas Law and Taxation, Southwest Legal Foundation, 281, 294, 297 (1953) points out the difficulty in applying the facts of the old "natural gasoline" cases to the high pressure recycling operations involved in a case such as this.

Here Taxpayer had enforceable rights for the life of the underlying leases. It had such definitive legal rights that it could compel the continued operation of the wells and the extraction of the gas. For the life of the contract (hence life of the leases), the Sellers had altogether relinquished their rights to make sales of, or contracts respecting, the delivery, processing, or sale of the gas covered by the contract. More important, as pointed out in detail above, what Taxpayer did here was *production* in a very real, as well as legal, sense.

### La Gloria's Contribution of Indispensable Facilities At Substantial Cost Was An "Investment".

It facilitates analysis of the element of looking solely to gas extracted for return of capital to keep in mind the unique meaning of "investment" in the Palmer v. Bender economic interest concept.

The term "investment" is not used in the traditional sense at all. For the purposes of this problem, the capital investment is synonymous with economic interest [28] or with the requirement that the taxpayer must have acquired an interest in the oil and gas in place.[29] Referring to depletion as the Congressional purpose "to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired," the Court in Commissioner of Internal Revenue v. Southwest Exploration Co., 350

U.S. 308, 312, note 3, 76 S.Ct. 395, at page 398, 100 L.Ed. 347, supra, stated "The present allowance, however, bears little relationship to the capital investment, and the taxpayer is not limited to a recoupment of his original investment. The allowance continues so long as minerals are extracted, and even though no money was actually invested in the deposit." [30]

### La Gloria Acquired an Economic Interest in Gas In Place.

As the facts—undisputed and detailed at length—reflect, La Gloria was committed unqualifiedly to the actual expenditure of large sums of money or the incurring of unreimbursable liabilities for the construction of the entire cycling facilities. These facilities were absolutely indispensable to production. In exchange for this unqualified commitment, the Sellers were under equal and reciprocal long-term commitments for the full term of the underlying mineral leases. The Sellers had the leases. They thought they had commercial production. But they did not know. La Gloria had capital or the means of acquiring it or credit. La Gloria was willing to, and did, expend its funds, pledge its credit and expose itself to unreimbursable liabilities for a dual purpose. This was to (1) explore the field and thus exploit the productive sands and (2) produce the marketable HH. For this La Gloria was to have 50 per cent of the HH from gas produced. The Sellers were unqualifiedly committed to make good this 50 per cent

28. See Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 35, note 3, 66 S.Ct. 861, 867, 90 L.Ed. 1062, supra: "Through retention of certain rights to payments from oil or its proceeds in himself, each of these assignors of partial exploitation rights in oil lands has maintained a capital investment *or* economic interest in the oil or its proceeds." (Emphasis supplied.)

29. See Sneed, note 1, supra, at 317, note 45. See also Rev.Rul. 56–542, 1956 Int. Rev.Bull. No. 44 at 15, referred to therein, which defines economic interest in terms of three factors, the second of which is "the right must stem from an

investment." This is then defined: "Investment means the acquisition of a direct equity in the ore, not acquisition by stock ownership which is indirect [citing Helvering v. O'Donnell, note 3, supra] not acquisition of a 'creditor's interest' [citing Commissioner of Internal Revenue v. Caldwell Oil Corp., 5 Cir., 141 F. 2d 559]."

30. See also Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 34, note 3, 66 S. Ct. 861, 867, supra, "The cost of that investment to the beneficiary of the depletion under Section 114(b) (3) is unimportant."

interest to La Gloria. Both were irrevocably bound.

In a realistic sense this was a wedding of the natural resource which the Sellers owned with the cycling plant which La Gloria was to build. Even if the contracts did not amount to a conveyance of legal title as such, there was a substantial relationship between the two. La Gloria might not have the technical contractual right of control of the production wells since this was reserved in form to the Sellers. But the operation contemplated and actually involved control by La Gloria of those operations indispensable to production. The production wells could not be opened, could not be allowed to flow, unless the methane (94%) gas was to be reintroduced into the reservoir under high pressures. This could not be done without the operation of La Gloria's compressors, return pressure lines, input wellhead connections, and other parts of the cycling plant. This was wholly the responsibility of La Gloria. La Gloria alone did it.

Consequently, being indispensable to production, substantial in dollar cost, within the operational control of La Gloria who would be directly benefited, the relationship was such that, except for the return of capital factor to be discussed, La Gloria acquired by these contracts a genuine interest in the gas in place.[31]

These factors are more present here than in Southwest Exploration in which the contracts expressly excluded any ownership or interest of any kind by the upland owners in the minerals, in place or elsewhere, or in the right to control drilling or production.

Obviously the acquisition of an interest in the gas in place cannot depend on the *angle* of assistance. In Southwest Exploration the upland owners furnished the base for the well hole drilled *diagonally* by a whipstock. Here the indispensable facility is the network of *horizontal* return high pressure lines to the input wells. Nor, consistent with the approach that "the tax law deals in economic realities, not legal abstractions," Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, at page 315, note 3, 76 S.Ct. 395, at page 399, supra, can it be significant that what La Gloria furnished was not a hole in the ground (i. e., *real* property), but was a pipe (*personal* property) to be fastened onto the connections with the hole in the ground. Indeed, contribution of services, or moveable facilities, drilling rigs, etc., may and do afford an adequate basis for depletable interests in oil or similar payments. Commissioner of Internal Revenue v. Rowan Drilling Co., 5 Cir., 1942, 130 F.2d 62.

Interpolating only "personal" for "real" brings this arrangement and relationship precisely within Southwest Exploration for on this record La Gloria was "a party essential to the drilling for and the extraction of oil [who] has made an indispensable contribution of the use

31. Sneed, The Economic Interest—An Expanding Concept, 35 Tex.L.Rev. 307, 335, note 1, supra, deduces "Three basic ideas [which] have shaped the present meaning of this * * * requisite of an economic interest. These are as follows:

"(1) To possess an interest in minerals in place the interest should be one that carries with it some legal or equitable ownership of the minerals in place. This idea has caused the courts to examine, in many instances at least, the precise legal form or nature of the instrument creating or reserving the interest.

"(2) One should be considered to have an interest in place when his control and beneficial enjoyment of the income from the mineral deposit are such as to warrant considering him the substantial owner, in the tax sense, of a part or the whole thereof. The duration of this control and beneficial enjoyment is also relevant in fixing ownership for tax purposes.

"(3) An interest in minerals in place should exist when permitting depletion on the income from that interest would serve the purposes for which the allowance was created. That is, in determining whether a taxpayer has an interest in the minerals in place, his contribution to discovery, development, or operation should be examined. If it is significant, this is some reason for considering him to be in possession of an economic interest and consequently, entitled to the depletion allowance."

of [*personal*] property adjacent to the oil deposits * * *." 350 U.S. at page 317, 76 S.Ct. at page 400.

And whatever conclusions one might reach on the facts here concerning factors (1) and (2) in the Supreme Court's analysis of the strip mining cases, Parsons v. Smith (Huss v. Smith), 1959, 359 U.S. 215, 79 S.Ct. 656, 663, 3 L.Ed.2d 747, 754, factors (3) through (7) decisive because absent there, are equally decisive because present here.

" * * * (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that petitioners could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that petitioners were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered, which was, as stated in Huss * * *, agreed to be in 'full compensation for the full performance of all work and for the furnishing of all [labor] and equipment required for the work'; and (7) that petitioners, thus, agreed to look only to the landowners for all sums to become due them under their contracts. The agreement of the landowners to pay a fixed sum per ton for mining and delivering the coal 'was a personal covenant and did not purport to grant [petitioners] an interest in the [coal in place].'"

### Return of La Gloria's "Capital" Depends Solely on Extraction of Gas.

In considering the Palmer v. Bender return of "capital" factor, the term capital can refer to two things: (a) the amount of money (or assets) contributed in the acquisition of the interest in oil-gas; or (b) the return of that portion of the thing acquired (oil-gas) which represents one's ownership in the thing itself. The latter refers, of course, to that portion of the proceeds from the sale of each barrel of oil as represents not income but mere return of the depletable asset.

The Court is preoccupied almost altogether with the first. That it has done so is not surprising for this facet has been much argued. But to me the real importance of the substantial expenditure of funds or credit by La Gloria is to demonstrate the necessary mutually reciprocal commitments of the cycling plant by La Gloria and the leasehold gas reserves by Sellers for the life of the field.

But even if this is the "capital" the return of which must depend on gas extracted, then I think this is more than satisfied here.

We are concerned in this case only with revenues received under contracts A, B and C. See text at note call 12, supra. We are not concerned with the taxability of the 20 per cent of La Gloria's income which in later years it has obtained from outside sources. That income arose long after the cycling plant was built and installed, and long after the three initial contracts which brought the cycling plant into being. At the time the cycling plant was built, and at the time the large expenditures were made, see notes 18 and 21, supra, the only possible source for the return of these sums was out of the gas to be produced by and processed through this plant. And there is not a single stitch of evidence in this record from which the Court could infer that any of the parties at that time had any basis for anticipating the availability of gas from other areas.

It is also important to bear in mind that as this case comes to us, the income from each of the three separate contracts, the tax and depletion referable to each is carefully segregated and independently considered. The supposition posed by the Court which leads it to think that La

Gloria is "playing the field" is an illusory one. If and when South La Gloria Field runs dry, there will be no income received by La Gloria from that production and processing as to which it must look for the return of any portion of its capital. To secure a return of "capital" first from South La Gloria, then La Gloria, and then Moos, would still be to secure it solely from the extraction and sale of gas. This contention is, of course, a development of the Court's revolutionary thesis concerning multiple producing properties.[32] This leads the Court to make a pronouncement which has never even been remotely suggested in any of the considerable body of law in this well-worked field. The Court concludes: "Even if such could be the case, however, such an investment could not amount to the required 'economic interest,' because the production from no single mineral deposit could be looked to solely for a return of the capital investment."[33]

There is nothing in Anderson v. Helvering, 1940, 310 U.S. 404, note 3, 60 S.Ct. 952, 84 L.Ed. 1277, supra, requiring that the owner of an interest in gas or oil in place look only to a particular sand or reservoir or pool or lease. The principle of that case forbids any source other than a mineral, but that is because the statutory depletion allowance relates to minerals and not, as in that case, to fee lands or to chattels. Sneed considers this to be no violation of Anderson. Sneed, note 1, supra, at 330. And, as

discussed above, if any portion of the revenues giving rise to the income upon which the depletion is claimed came from a particular strata or reservoir or lease or pool or sand, then to that extent La Gloria is looking to that gas, and that gas only, for the return of its capital. To the extent that no income is attributable to any such gas, then it is not involved at all. Percentage depletion is allowed because the proceeds from the sale of such depletable asset includes a portion of the asset itself. If the recovery of that capital or the investment made to acquire it depends, as it does here, upon the extraction and sale of gas from any one or more or all of the sands covered by the underlying leases pledged by the Sellers under the contracts with La Gloria, there is certainly no basis for invoking the Anderson rule. The source is all depletable minerals. This is the introduction of a new factor by this Court. It expresses great apprehension that there might be an extension. Its action is to do the opposite.

## Recoupment of Capital Is Not Recovery of Amounts Spent But Recovery of What Was Acquired by the Expenditure.

But this is not decisive, for the Court, I think, has misconceived what is the "capital" to be returned exclusively from extraction and sale of the gas.

Correctly used, capital involves the second meaning suggested above. It does not concern the recoupment of what was *spent* to acquire the interest in gas.

32. The Court states: "No case has been found where, as is true here, a taxpayer, by making substantial investment for the purpose of extracting minerals from several different producing properties, each having entirely unrelated reserves, has claimed that his investment in plant constitutes an investment in *any one* property. No case has been found where an investment *in gross* has been claimed to be an investment in definite *minerals in place.*"

33. This in turn causes the Court to conclude that La Gloria "did not look solely to the extraction of the minerals from any one property as to which it sought to claim depletion to recover the value

of the large investment; it looked to and actually received production from a vast area, including a multiple-sand, oil and gas field containing 35 different producing zones, of which those here involved comprised only three." I am at a loss to understand the Court's statement that "those here involved comprised only three." The undisputed Railroad Commission report and order, note 16, supra, shows that as to the 5,600,000 additional barrels of liquid hydrocarbons recovered by La Gloria's cycling plant operations, this involved 6 reservoirs, "namely the Stoltze, Culpepper, Brooks, North Bauman, Jim Wells and La Gloria Reservoirs." Perhaps the Court confuses three contracts with three reservoirs.

It concerns the return of the thing, i. e., gas *acquired* by that expenditure.

There is no better way to demonstrate this than to consider the case which gave rise to the limiting doctrine—Anderson v. Helvering, 310 U.S. 404, note, 60 S.Ct. 952, supra. The grantor owned royalty interests and oil payments and some fee lands. He sold all of these to the grantee. Had he been paid all in cash, it would have been an ordinary capital gains transaction, because he would have kept no interest in the oil. His ownership would have been terminated altogether (see Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, note 3, 58 S.Ct. 621, 82 L.Ed. 904, supra). But the grantor did not do this. The consideration for the purchase was $160,000. This was payable (a) $50,000 in cash, and (b) the balance of $110,000 out of (i) one-half of the oil produced on the properties conveyed, *and* (ii) sale of fee title to the *land* conveyed.

The question was the nature of the deferred balance of $110,000. This was the new interest acquired. It was this "interest" which was a new capital asset, and since that "interest" was payable out of oil and out of the sale of land, the owner would not get his "capital" back solely from extraction and sale of oil. Part would come from sale of lands.

But the question is not one of recovering the *cost* of an interest which has been acquired. It is a question of recovering a part of that interest itself. As originally conceived the depletion allowance was an effort to restore to the mineral owner *the value* of the mineral in place as of the time of discovery. Administra-tive problems were troublesome and Congress substituted the percentage depletion. It is as though Congress declared that of each barrel of oil, 27½ per cent of it represents the wasting asset. Parsons v. Smith (Huss v. Smith), 1959, 395 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747. It is that "capital" which the rule speaks about. It is not the expenditure made to obtain that interest that is to be recouped. A donee of a mineral lease under an absolute gift makes no expenditure. He has, however, acquired an ownership and to avoid paying an *income tax* on that portion of the proceeds received from its sale, he is entitled to deduct 27½ per cent as representing his "capital." A net profit transaction, Kirby Petroleum Co. v. Commissioner, 326 U.S. 599, note 29, 66 S.Ct. 409, 90 L.Ed. 343, supra; Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, note 3, 66 S.Ct. 861, 90 L.Ed. 1062, supra has an economic interest as profits are payable out of production. But the "capital" to be returned is not what was expended for the interest, but a recovery of that portion of the profits attributable to the sale of the ownership interest in the wasting asset, not the income from operations.[34]

But on either score there can be no question that the extraction of this gas was indispensable to the recovery of Taxpayer's capital investment. Unless gas flowed from these wells, there was no means by which it could recover either gas or a single cent of its expenditures whether for the drilling of the wells, the network of production gathering, the pressurizing lines, the compressor and recycling plant. Taxpayer's hope of capital recoupment and its "possibility of

---

**34.** These essential distinctions are illustrated: L is a lessee and owns and operates an oil well. He has tank batteries, well equipment and a substantial investment in surface casing, production string, gathering lines, separators, etc. Assume a value of this plant of $20,000. He sells one-half of the working interest to E including all of the plant. He gets $30,000 in cash and $100,000 payable out of E's share of the oil produced. The cash is capital gains, see Hammonds v. Commissioner, 10 Cir., 1939, 106 F.2d 420, 425; Commissioner of Internal Revenue v. Fleming, 5 Cir., 1936, 82 F.2d 324. Without a doubt the $100,000 oil payment is depletable even though all or a part of his original investment in plant and well was recouped by the cash payment. This is so because in the one-half sold by L to E, L owns only an oil payment, and to recover *that* (i.e., oil payment), he must look to it and nothing else. That satisfies the exclusiveness factor of "economic interest."

profit * * * [was] dependent solely upon the extraction and sale of the" gas. Kirby Petroleum Co. v. Commissioner, 326 U.S. 599, 604, note 3, 66 S.Ct. 409, 411, supra. Taxpayer's " * * * income was dependent entirely on production, and the value of [its] interest decreased with each barrel of [liquid hydrocarbons] produced." Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, at page 316, note 3, 76 S.Ct. 395, at page 400, supra.

### Production Includes the Separator and The Absorber.

I agree with the Court's opinion, note 4, that the Fractionator is not a part of production and on the stipulations the maximum recovery would be limited to 86½ per cent. While the Separator and Absorber are not at this time any longer directly involved. I mention them because they illustrate the indispensability of La Gloria's contribution to actual production.

Of course, the Separator is essential. Without separation there was a gas compound 94% of which was unusable, unsalable, and which could not be flared or burned. The same is true of the Absorber. The engineering scientific fact was uncontradicted that the Absorber was absolutely essential to recover commercially important heavier hydrocarbons. This included the compounds of butane and propane. Taxpayer's gas engineer testified without dispute that of the HH compounds only about ⅓ were recovered in the Separator. That means that the residue gas flowing out of the Separator on its way to compressors and return to the reservoir contained ⅔ of the HH compounds. This means also that unless the required step was taken to recover that ⅔ of the HH compounds, it would return to the reservoir. It would not be produced and presumably the cycle would continue on ad infinitum.

Recovery would have been but ⅓ of that otherwise achieved.

Adopting the figure of speech of the Government reducing this ⅔ of the HH compounds to effective possession required the Absorber. It does not make it any less production for the Government to urge that Taxpayer might have sold residue gas with these HH compounds at the discharge end of the Separator (or wellhead). Such a purchaser would have had to absorb out the HH compounds since the residue gas was irrevocably committed under Railroad Commission order for return under pressure to the reservoir. For anyone, whether this Taxpayer or a theoretical purchaser, to obtain effective dominion over this ⅔ of the HH compounds, the Absorber was indispensable. If without the Absorber these HH compounds would not have been recoverable and would have returned to the reservoir, that essential process is production. It matters not that absorption and distillation under other circumstances is a process found or employed in refineries.

### Depletion Allowance Fulfills Congressional Policy Here.

In the analysis, note 31, supra, the third factor was that "an interest in minerals in place should exist when permitting depletion on the income from that interest would serve the purposes for which the allowance was created." Here, on an undisputed record, La Gloria risked its credit for over $5,000,000 to enable all parties fully to exploit and develop a rich gas field. Without its contribution of credit, money and operation, this production would not have occurred. La Gloria's connection with it is direct, immediate and substantial. Its money, its efforts, its talents, its energies have helped to exploit, develop and produce gas. That is one of the aims of the statutory depletion, and it should be encouraged, not thwarted.

I therefore respectfully dissent.