171 F.Supp. 617 (1957)
LA GLORIA OIL & GAS COMPANY, a Delaware corporation, and La Gloria Corporation, a dissolved Texas corporation, Plaintiffs,
v.
Frank SCOFIELD, formerly Collector of Internal Revenue, Kirby H. Jackson, formerly Acting Collector of Internal Revenue, and Robert L. Phinney, formerly Acting Collector of Internal Revenue and now District Director of Internal Revenue, First District of Texas.
Civ. A. Nos. 778, 830, 831, 930.
United States District Court W. D. Texas, Austin Division.
December 19, 1957.
Judgment Reversed June 16, 1959.
*618 Marvin K. Collie, Houston, Tex., Binford Arney, Corpus Christi, Tex., Clyde L. Wilson, Jr., Houston, Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel, for plaintiffs.
Russell B. Wine, U. S. Atty., San Antonio, Tex., Charles Mehaffy, Attorney, Department of Justice, Washington, D. C., for defendants.
BEN H. RICE, Jr., District Judge.
In the above styled and numbered cause, which was tried before the Court without a jury, the Court, having fully considered the pleadings, the evidence, and the briefs submitted by the parties, makes the following Findings of Fact and Conclusions of Law:

Findings of Fact

1.
These suits are properly brought under Section 1340 of Title 28 United States Code, for the recovery of $229,612.67, $289,922.57, $231,547.43, $269,634.88, $391,630.15 and $18,005.31, assessed against plaintiff La Gloria Corporation (La Gloria) as income tax for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively, and $17,098.29, $2,296.83, $3,876.31, $3,292.53, and $957.94, assessed against La Gloria as interest for the fiscal years ended August 31, 1947, August 31, 1949, August 31, 1950, August 31, 1951 and August 31, 1952, respectively, and, as such, collected from La Gloria by the defendant, the Collector of Internal Revenue for the First District of Texas, Austin, Texas, together with interest thereon at the rate of 6% per annum from the dates of payment to defendant thereof.

2.
Plaintiff La Gloria Oil & Gas Company (Oil & Gas) is a corporation duly organized and existing under the laws of the State of Delaware and has its principal office and place of business in Corpus Christi, Nueces County, Texas.

3.
Oil & Gas, as of May 1, 1954, pursuant to a plan of complete liquidation of La Gloria, acquired all of the properties and assets of La Gloria, including but not limited to the natural gas processing and cycling plant, the gas gathering and return pipe lines, the liquid hydrocarbon compounds conveyance agreements, and all claims and choses in action which La Gloria had or was entitled to have. All of said properties and assets were conveyed by La Gloria to Oil & Gas subject to all debts, liabilities and contractual obligations of La Gloria; and Oil & Gas assumed all of the debts, liabilities and contractual obligations of La Gloria.

4.
La Gloria, a dissolved Texas corporation, acts herein and files this proceeding by and through John F. Lynch, Paul R. Haas, T. S. Scibienski, Binford *619 Arney, Guy C. Kiddoo, T. E. Wilson, E. F. Johnson, and Edward E. Wilson, all of the directors of such corporation at the time of its dissolution, said Trustees having authority to institute judicial proceedings in the name of the dissolved Texas corporation pursuant to Articles 1388 and 1389, Vernon's Ann. Civil Statutes of Texas.

5.
La Gloria, subsequent to the conveyance of its said properties and assets as aforesaid, was dissolved, and certificate of dissolution was issued by the Secretary of State, State of Texas, on May 19, 1954.

6.
Defendants, Frank Scofield and Robert L. Phinney are residents of Travis County, Texas; defendant Kirby H. Jackson is a resident of Dallas County, Texas; defendant Frank Scofield was Collector of Internal Revenue for the First District of Texas from November 21, 1933, to February 29, 1952. Defendant Kirby H. Jackson was Acting Collector of Internal Revenue for the First District of Texas from March 1, 1952, to August 14, 1952. Defendant Robert L. Phinney was Acting Collector of Internal Revenue for the First District of Texas from August 15, 1952, to November 18, 1952, after which he began serving as District Director of Internal Revenue. All defendants served in their respective office in the First District of Texas and during the times pertinent to all matters involved in these proceedings.

7.
In filing its United States corporation income tax returns for the fiscal years ending August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, La Gloria reflected thereon income taxes due for such fiscal years in the amounts of $389,640.94, $464,063.05, $209,333.69, $1,290,441.63, $737,077.68 and $6,128.51, respectively, and paid such amounts to the respective defendants quarterly, commencing November 15, 1947, November 15, 1948, November 15, 1949, November 15, 1950, November 15, 1951, and November 15, 1952.

8.
The Commissioner of Internal Revenue caused the returns of La Gloria for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, to be examined and, thereafter, determined that deficiencies in income tax were due by La Gloria for such fiscal years in the amounts of $113,679.03, $26,712.57, $22,213.74, $57,038.98, $20,389.78, and $11,876.80, respectively. Such amounts (together with interest thereon in the amounts of $25,395.59, $4,364.76, $2,296.83, $3,876.31, $3,292.53, and $957.94, for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively) were assessed against and collected from La Gloria (with such amounts applicable to the years ending August 31, 1947, August 31, 1948 and August 31, 1949, being assessed and collected on August 6, 1951, with such amounts applicable to the year ending August 31, 1950, being assessed and collected on or before May 15, 1952, and with such amounts applicable to the years ending August 31, 1951 and August 31, 1952, being assessed and collected on or before November 4, 1954).

9.
In its returns for the fiscal years ended August 31, 1947, August 31, 1948, and August 31, 1949, and in computing the net income as reflected on said returns, La Gloria was not allowed a deduction in any of such returns depletion computed on its income from the liquid hydrocarbon compounds, which compounds it was entitled to take pursuant to contracts hereinafter described, and which compounds were separated and saved from the natural gas in and under and which were produced from certain leaseholds covering lands in Jim Wells and Brooks Counties, Texas. In its returns for the fiscal years ending August 31, 1950, August 31, 1951, and August 31, *620 1952, and in computing the net income as reflected on said returns, La Gloria did not then claim as a deduction in any of such returns depletion computed on its income from the liquid hydrocarbon compounds, which compounds it was entitled to take pursuant to contracts hereinafter described and which compounds were separated and saved from the natural gas in and under and which were produced from certain leaseholds covering lands in Jim Wells and Brooks Counties, Texas; and subsequently La Gloria filed with the respective defendants a claim for refund of income taxes collected in the amount of depletion computed on its income from said liquid hydrocarbon compounds. Said leaseholds are more fully described in Contracts A, B and C, hereinafter described.

10.
La Gloria's gross income from the sale of liquid hydrocarbon compounds which compounds it was entitled to take pursuant to the contract hereinafter identified as Contract A, and which compounds were produced from the La Gloria Unit, amounted to $1,673,955.43, $2,075,674.03, $2,011,563.64, $1,707,077.53, $2,334,301.09, and $1,606,223.22, for the fiscal years ending August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively.

11.
La Gloria's gross income from the sale of liquid hydrocarbon compounds, which compounds it was entitled to take pursuant to the contract hereinafter identified as Contract B and which compounds were produced from the South La Gloria Unit, amounted to $471,050.41, $645,698.71, $635,817.89, $697,758.22, $533,397.66, and $338,513.34, for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively.

12.
La Gloria's gross income from the sale of liquid hydrocarbon compounds which compounds it was entitled to take pursuant to the contract hereinafter identified as Contract C and which compounds were produced from the Moos Unit, amounted to $52,244.69, $53,003.03, $45,848.76, $37,439.86, $32,970.95, and $23,514.65, for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively.

13.
The La Gloria Field is a multiple sand oil and gas field in Jim Wells and Brooks Counties, Texas. This area includes the "La Gloria Unit", the "South La Gloria Unit", and the "Moos Unit". The thirty-five producing zones of this field contain reserves of oil and natural gas, approximately 94% of which gas consists of the lighter hydrocarbon compound of methane and the approximately 6% consists of the heavier hydrocarbon compounds of ethanes, propanes, butanes, pentanes, hexanes, and heptanes and heavier ones (the methane and such heavier hydrocarbon compounds are herein referred to collectively as "hydrocarbon compounds" and such heavier hydrocarbon compounds are referred to herein by that name). Each of these hydrocarbon compounds exists in a natural vapor state in the high pressure reservoirs in which the pressures are three to four thousand pounds.

14.
In 1940 certain oil and gas companies and individuals ("Magnolia et al.") owned interests in undeveloped oil and gas leases in the La Gloria Field. Prior to June 4, 1940 (the date of first contract here concerned) five exploratory wells had been drilled in the field by Magnolia et al. and established the existence of the hydrocarbon compounds in some of the reservoirs underlying a portion of certain leases. There existed the contingent possibility that the drilling of a number of additional wells would develop substantial reserves of additional hydro-carbon compounds.

15.
For the years 1940 through 1950, insofar as the La Gloria Field was concerned *621 there existed no available substantial market for methane, but there did exist available markets for some of the heavier hydrocarbon compounds. (In 1951 and 1952 a market for some quantities of methane did become available to the La Gloria Field.) Under the conservation laws of Texas, in the absence of an available market for methane, the production of natural gas from the La Gloria Field, and the separation therefrom of the heavier hydrocarbon compounds, followed by the flaring of the residue gas (methane) would have constituted physical waste and would not have been permitted. Therefore, the only existing feasible means of obtaining an economic return from the natural gas reserves was a method of separating the marketable heavier hydrocarbon compounds from the natural gas and then returning the remaining residue to the gas producing formations. The common method of producing and separating such hydrocarbons is cycling, which is the process for producing the maximum quantity of heavy hydrocarbons contained in the high pressure gas in gas reservoirs.

16.
Not only was this production procedure necessary to prevent the waste of the residue gas, but the injection of the residue gas was necessary to maintain pressure in the reservoir. If the reservoir pressure is not maintained by cycling (the only method available), retrograde condensation occurs as follows:
The gas in the La Gloria Field exists in the reservoir under high pressure and high temperature in a single gas phase. If the gas is produced without the return of the residue gas under high pressure, pressure in the reservoir is reduced and a portion of the heavier hydrocarbons is condensed in the reservoir and covers the reservoir sand grains in a liquid form so that such heavier hydrocarbons are not produced with gas otherwise produced and consequently are lost permanently and irretrievably.

17.
Retrograde condensation is a natural phenomena that only occurs in high pressure gas reservoirs above a pressure of 1,200 pounds. Through cycling, La Gloria will be able to recover 8,800,000 barrels of heavier hydrocarbons that otherwise would have been lost by retrograde condensation. The state regulatory body (Railroad Commission of Texas) in charge of cycling in the La Gloria Field has found by its official orders, after hearings had been held, the substance of the facts reflected in this paragraph.

18.
The cycling process, the only feasible means of recovering the heavier hydrocarbon compounds and maintaining the pressure, involves: (1) the establishment of adequate natural gas reserves (2) the construction and operation of a natural gas separation plant (3) the construction and operation of gathering lines and return lines, (4) the existence and operation of the necessary producing gas wells and input gas wells, and (5) the construction and operation of the requisite compressors and other facilities for compressing the residue gas to a pressure in excess of that existing in the gas-producing formations. The operation of these cycling facilities involves producing the wet gas, including the heavier hydrocarbon compounds, by the means of gas output wells, gathering the high pressure gas through gathering lines to a plant, separating the heavier hydrocarbon compounds therefrom in such plant (including the separation of each compound from the other) compressing the residue gas to a pressure higher than that in the reservoir, and returning the residue gas through return lines to input wells, the reinjection of such gas through input wells to producing formations, the maintenance of pressure in the reservoir, and the forced flow or migration of heavier hydrocarbon compounds toward the producing wells.

*622 19.
The agreement and conveyance herein called Contract A (and identified as Exhibit A in the trial of this cause) and relating to the La Gloria Unit bearing date of June 4, 1940, was executed by Magnolia Petroleum Company, et al., as Sellers, and La Gloria's predecessors in title as Buyer upon the understanding that said predecessors were acting for the corporate entity La Gloria then being incorporated under the laws of the State of Texas, and that said agreement would be assigned by such Buyers to La Gloria, and that La Gloria would in fact become the Buyer under said agreement. Contract A was assigned to La Gloria as of date September 28, 1940.

20.
The agreement and conveyance herein called Contract B (and identified as Exhibit B in the trial of this cause) and relating to the South La Gloria Unit bearing date of June 16, 1941, was executed by Magnolia Petroleum Company et al., as Sellers, and La Gloria as Buyer.

21.
The agreement and conveyance herein called Contract C (and identified as Exhibit C in the trial of this cause) and relating to the Moos Unit bearing date of May 31, 1943, was executed by The Texas Company et al., as Sellers, and La Gloria as Buyer.

22.
The agreements and conveyances identified as Contracts A and B hereof describe the heavier hydrocarbon compounds under the terminology of "natural gasoline, condensate, and other products". Said agreements recite that Buyer is desirous of purchasing from Sellers and that Sellers are desirous of selling to Buyer the
"natural gasoline, condensate and other products contained in all gas in and under and to be produced from said leases and lands, together with the right to process said gas for the extraction of such gasoline, condensate and other products therefrom",
with the obligation of Buyer to return the residue gas into gas producing formations. The Sellers under said agreement and conveyance, in consideration of the undertakings of the Buyer, severally, grant, bargain and sell unto Buyer all "natural gasoline, condensate and other products contained in all gas to be produced from his or its lands located in the above mentioned and described field during the full term of said leases and any renewals, modifications, or extensions thereof", and "the right to extract such natural gasoline, condensate and other products from said gas". Buyer obligated itself to separate and recover the heavier hydrocarbon compounds and to turn over to Sellers as their retained share of the heavier hydrocarbons so recovered by Buyer 55% thereof when the "G.P.M." content of the natural gas is one gallon or more, and 50% thereof when the "G.P.M." content of the natural gas is less than one gallon.

23.
Under the terms of the agreement and conveyance identified as Contract A hereof, in addition to delivering to "Sellers" their retained share of the heavier hydrocarbons recovered, "Buyer", among other things, obligated itself to:
(a) Construct at its expense and by its capital investment, and operate, a processing and recycling plant, gathering lines and return lines, adequate to enable Buyer to gather and process therein 150,000,000 cubic feet of gas per day and to return the residue gas to gas producing formations.
(b) Construct at its expense and by its capital investment, and operate, gas measuring stations at each producing well, at each input well, at the inlet of the processing plant, and at the outlet of the processing plant.
(c) Use its best efforts at its expense and by its capital investment to secure the execution of the La Gloria Unit Unitization Agreement by royalty and mineral owners having title to at least 51% of the royalty and mineral rights *623 under the lands embraced within the confines of said unit.
(d) Drill and equip at its expense and by its capital investment a sufficient number of producing gas wells (not to exceed 20 in number) to enable production of 150,000,000 cubic feet of gas per day or so much thereof as could be legally produced from said 20 wells, and input wells equipped for the return of the residue gas to the formations from which the same is produced. Buyer was to be repaid the cost and expense of drilling and equipping such producing wells and such input wells solely from the proceeds of the heavier hydrocarbon compounds recovered in its plant which accrue to the Sellers from their retained portion of such hydrocarbons.

24.
Under the terms of the agreement and conveyance identified as Contract B hereof, in addition to delivering to "Sellers" their retained share of the heavier hydrocarbons recovered, "Buyer", among other things, obligated itself to:
(a) Construct at its expense and by its capital investment, and operate, additional facilities as a part of its existing processing and recycling plant, gathering lines and return lines, adequate to enable Buyer to gather and process therein an additional 54,000,000 cubic feet of gas per day and to return the residue gas to gas producing formations.
(b) Construct at its expense and by its capital investment, and operate, gas measuring stations as set forth in Paragraph 23(b) hereof.
(c) Use its best efforts at its expense and by its capital investment to secure the execution of the South La Gloria Unit Unitization Agreement by royalty and mineral owners having title to at least 51% of the royalty and mineral rights under the lands embraced within the confines of said unit.
(d) Drill and equip at its expense and by its capital investment a sufficient number of producing gas wells (not to exceed 7 in number) to enable production of 54,000,000 cubic feet of gas per day or so much thereof as could be legally produced from said 7 wells, and input wells equipped for the return of the residue gas to the formations from which the same was produced. Buyer was to be repaid the cost and expense of drilling and equipping such producing wells and such input wells solely from the proceeds of the heavier hydrocarbon compounds recovered in its plant which would accrue to the Sellers from their retained portion of such hydrocarbons.

25.
Under the terms of said agreement and conveyance identified as Contract C hereof, in addition to delivering to "Sellers" their retained share of the heavier hydrocarbons recovered, "Buyer", among other things, obligated itself to:
(a) Operate its then existent processing and recycling plant and to construct at its expense and by its capital investment, and operate, gathering lines and return lines, adequate to enable Buyer to gather and process therein quantities of gas produced from the Moos Unit and to return the residue gas to the gas producing formations.
(b) Construct at its expense and by its capital investment, and operate, gas measuring stations as set forth in Paragraph 23(b) hereof.
(c) Produce, operate and maintain all producing gas wells and to produce gas ratably with that produced from the La Gloria Field; and to have the exclusive right to take gas from all formations capable of producing gas that have been penetrated by the wells to be located on the lands and leases.

26.
In the year 1940 and the first half of the year 1941 La Gloria made a capital investment in the liquid hydrocarbon compounds which were conveyed to it by the agreement and conveyance identified as Contract A and constructed its original natural gas processing and cycling plant at a cost and capital investment to it of approximately $1,756,000; and constructed its original gas gathering pipe *624 lines, return pipe lines, and metering stations at a cost and capital investment to it of approximately $172,000; and secured the execution of the La Gloria Unit Unitization Agreement by more than 90% of the royalty and mineral owners at a cost and capital investment to it of approximately $41,000; and pursuant to said contract drilled and equipped 12 gas wells on lands within the La Gloria Unit at a cost of approximately $548,000 and to be equipped at a cost of approximately $264,000.

27.
In the last half of the year 1941 and the year 1942 La Gloria made a capital investment in the liquid hydrocarbon compounds which were conveyed to it by the agreements land conveyances identified as Contracts A, B and C and constructed additional facilities to its natural gas cycling plant at a cost and capital investment to it of approximately $508,000; and constructed additional gathering pipe lines, return pipe lines, and metering stations, at a cost and capital investment to it of approximately $28,000; and secured the execution of the South La Gloria Unitization Agreement by more than 90% of the royalty and mineral owners at a cost and capital investment to it of approximately $1,400; and pursuant to Contract B drilled and equipped 4 gas wells on lands within the South La Gloria Unit at a cost of approximately $217,000 and equipped at a cost of approximately $84,000 and capital investment to it of approximately $301,000.

28.
In the year 1943, La Gloria made a capital investment in the liquid hydrocarbon compounds which were conveyed to it by the agreement and conveyance identified as Contract C and constructed additional gathering pipe lines and metering stations, at a cost and capital investment to it of approximately $3,300.

29.
In the year 1945 La Gloria made a capital investment in the liquid hydrocarbon compounds which were conveyed to it by the agreements and conveyances identified as Contracts A, B and C and constructed additional facilities to its natural gas cycling plant at a cost and capital investment to it of approximately $1,800,000; and in the years 1944 through 1948 made a capital investment in the liquid hydrocarbon compounds which were conveyed to it by the agreements and conveyances identified as Contracts A, B and C, and constructed additional gathering pipe lines and return pipe lines at a cost and capital investment to it of approximately $30,000.

30.
The only source that La Gloria had to recoup its capital investment, described above, was from its share of the hydrocarbons produced and La Gloria was dependent solely upon the production of such hydrocarbons from the realization of its interests in the hydrocarbons in place.

31.
Under date of November 4, 1940, La Gloria entered into a written agreement with Gray & Wolfe, a partnership, whereunder said partnership agreed to drill the wells which La Gloria was obligated to cause to be drilled under the terms of Contract A, with La Gloria continuing to have the obligation to furnish all equipment for each such well including casing and tubing. This drilling contract provided that payment of the drilling costs would be made out of the funds provided for that purpose in the agreement dated June 4, 1940, identified as Contract A.
Gray & Wolfe accepted as payment of drilling costs of each well a letter addressed to them which was signed by the Chairman of the La Gloria Operators Committee, stating that Gray & Wolfe are entitled to receive for their services performed a specific sum with interest at the rate of 4% "out of the fund created for the payment of drilling costs under the terms of the contract for sale of gas products made and entered into between Magnolia Petroleum Company et al., and *625 Robert T. Wilson, et al., affecting the La Gloria Field". At the bottom of said letter was the notation "The above certificate is accepted and is correct", and such notation was signed by La Gloria and Gray & Wolfe.
Under date of December 9, 1940, La Gloria entered into a written contract with Continental Supply Company whereunder such company would sell all equipment for the completion of the wells which La Gloria was obligated to cause to be drilled and completed under the terms of Contract A, and the contract provided that Continental would receive payment for the equipment sold by it out of a proportionate part of the fund created by the said Processing Contract for the payment of the equipment costs and that an instrument entitled certificate of indebtedness and bearing interest at 4% would be issued with reference to the equipment furnished for each well. This contract further provided that La Gloria would "guarantee and warrant unto Continental that its total account for the equipment for said wells, together with interest thereon at the rate of six per cent (6%) per annum from invoice date until paid, will be paid to Continental, and that payment of each Operators Committee certificate issued to Continental will be received by Continental within eighteen (18) months after its date of issue and La Gloria will pay in cash to Continental any portion of the principal and interest remaining unpaid at the expiration of such period and will pay Continental the difference in interest accrued as called for in the Operators certificate and the interest rate of six per cent (6%) called for in La Gloria Corporation's guarantee."
Continental accepted as payment of equipment costs of each well La Gloria guarantee contained in said agreement dated December 9, 1940.

32.
As a part of the cycling process, as described above, it is necessary to use a plant facility within which the hydrocarbons are separated. Essentially, the flow of the whole gas through the plant is as follows: The wet field gas flows through a "separator", when, by a drop in pressure and temperature, a part of the heavier hydrocarbons fall out by gravity to the bottom of the separator and are transmitted to the "Raw Feed Tank". (At this point the separator phase has been completed.)

33.
The gas containing the remainder of the heavier hydrocarbons flows through an "absorber". Such remaining heavier hydrocarbons are there absorbed into an oil solution ("rich oil"). The dry gas (methane) is then compressed and injected into the formation. The oil solution is heated; and the heavier hydrocarbons are thereby vaporized by heat out of the oil, cooled so as to become a liquid again and transmitted to the Raw Feed Tank. (At this point the absorption phase has been completed.)

34.
All of the heavier hydrocarbons are then in a liquid commingled state in the Raw Feed Tank.

35.
The heavier hydrocarbons then flow through a fractionator where, by means of changes in temperature and pressure, the different hydrocarbons are separated. (At this point the fractionation phase has been completed.)

36.
In the separation of the heavier hydrocarbons from the methane and in the separation of the heavier hydrocarbons, respectively, there is no change chemically between the hydrocarbons in the reservoir (when they obviously are not a manufactured product) and after the separation in the cycling plant. Nothing is added to the hydrocarbons. The only change is from a vapor state to a liquid state.

37.
Magnolia, et al., had no lease separators. La Gloria's employees controlled the flow of gas out of the reservoir and La Gloria's plant.

*626 38.
On or about November 13, 1951, La Gloria filed with defendant a claim for refund of income tax collected by defendant in the amount of $289,922.27 for the fiscal year ended August 31, 1948. On or about November 7, 1952, La Gloria filed with defendant claims for refund of income taxes collected by defendant in the amounts of $229,612.67 and $231,547.43 for the fiscal years ended August 31, 1947 and August 31, 1949, respectively, and interest collected by Defendant in the amounts of $17,098.29 and $2,296.83 for the fiscal years ended August 31, 1947, and August 31, 1949, respectively. On or about May 26, 1954, La Gloria filed with defendant a claim for refund of income tax collected by defendant in the amount of $269,634.88 for the fiscal year ended August 31, 1950, and for interest collected by defendant in the amount of $3,876.31 for said fiscal year. On or about November 5, 1942, La Gloria filed with defendant a claim for refund of income tax collected by defendant in the amount of $391,630.15 for the fiscal year ended August 31, 1951, and for interest collected by defendant in the amount of $3,292.53 for said fiscal year. On or about November 5, 1955, La Gloria filed with defendant a claim for refund of income tax collected by defendant in the amount of $18,005.31 for the fiscal year ended August 31, 1952, and for interest collected by defendant in the amount of $957.94 for said fiscal year.

39.
Each of the aforesaid claims were timely and duly filed with defendant on United States Treasury Department Form 843 in accordance and in compliance with the applicable provisions of the Revenue Code of the United States and the Regulations promulgated thereunder by the Commissioner of Internal Revenue in effect at such time.

40.
Notices of disallowance in full of La Gloria's claims for refund for the fiscal years ended August 31, 1947 and August 31, 1949, were given by Registered Mail on April 22, 1953, and for the fiscal year ended August 31, 1948, on June 12, 1952, and for the fiscal year ended August 31, 1950, on November 22, 1954, by direction of the Commissioner of Internal Revenue. No notice or other communication disallowing La Gloria's claims for refund for the fiscal years ended August 31, 1951, and August 31, 1952, have been received from the Commissioner of Internal Revenue. With respect to the claims for refund for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, and August 31, 1950, complaints for each such fiscal year were filed before the expiration of two years from the respective dates of mailing of said notice; and with respect to the claims for refund for the fiscal years ended August 31, 1951, and August 31, 1952, complaints for each such fiscal year were filed after the expiration of six months from the submission of the claims for refund for such fiscal year.

41.
Repayment of the amounts of income tax set forth in each of said claims for refund has been demanded, but no part of said sums has been credited, remitted, refunded or repaid in any manner to the plaintiffs, or to any one or more of them.

42.
La Gloria is entitled to depletion on all of its income from the sale of its liquid hydrocarbon compounds produced from the La Gloria Unit and that depletion amounts to $460,337.74, $570,810.36, $553,180.00, $469,446.32, $641,932.80 and $441,711.39, for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively.

43.
La Gloria is entitled to depletion on all of its income from the sale of its liquid hydrocarbon compounds produced from the South La Gloria Unit and that depletion amounts to $129,538.86, $177,567.15, $174,849.92, $191,883.51, $146,684.36 *627 and $93,091.17, for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively.

44.
La Gloria is entitled to depletion on all of its income from the sale of its liquid hydrocarbon compounds produced from the Moos Unit and that depletion amounts to $14,367.29, $14,575.83, $12,608.41, $10,295.96, $9,067.01, and $6,466.52, for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively.

Conclusions of Law

1.
I conclude that the court has jurisdiction of the parties and of the cause of action.

2.
I conclude that the plaintiffs, La Gloria Oil & Gas Company and La Gloria Corporation (both are referred to herein as "La Gloria"), are entitled to depletion of the respective shares of each of the liquid hydrocarbons produced from the La Gloria Field because La Gloria had an economic interest in such liquid hydrocarbons.

3.
I conclude that La Gloria acquired by investment an interest in the hydrocarbons in place in the La Gloria Field because:
(a) La Gloria contributed essential facilities to the production of the hydrocarbons through the investing and risking of millions of dollars in drilling and equipping wells and building a cycling plant, and
(b) La Gloria was engaged in the production of the hydrocarbons from the La Gloria Field, and
(c) La Gloria received a right to the heavier hydrocarbons in place because it was conveyed an interest in the hydrocarbons in, under and to be produced from the La Gloria Field.

4.
I conclude that La Gloria had to look solely to production from the La Gloria Field for the recovery of its capital investment.

5.
I conclude that La Gloria is entitled to depletion on all of its income from its share of the production of the hydrocarbons produced and extracted from the La Gloria Field because all of the hydrocarbons recovered in the separation plant are a part of the production process and are indispensable to the extraction of such hydrocarbons in the same chemical form as they were in the earth.

6.
I conclude that since La Gloria is entitled to depletion on one hundred percent of its income from the sale of liquid hydrocarbon compounds produced from the La Gloria Unit, then that depletion amounts to $460,337.74, $570,810.36, $553,180.00, $469,446.32, $641,932.80, and $441,711.39, for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively.

7.
I conclude that since La Gloria is entitled to depletion on one hundred percent of its income from the sale of liquid hydrocarbon compounds produced from the South La Gloria Unit, then that depletion amounts to $129,538.86, $177,567.15, $174,849.92, $191,883.51, $146,684.36 and $93,091.17, for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively.

8.
I conclude that since La Gloria is entitled to depletion on one hundred percent of its income from the sale of liquid hydrocarbon compounds produced from the Moos Unit, then that depletion amounts to $14,367.29, $14,575.83, $12,608.41, $10,295.96, $9,067.01, and $6,466.52, for the fiscal years ended August *628 31, 1957, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively.

9.
I conclude that the Commissioner of Internal Revenue erred in rejecting plaintiffs' claims for refund and that La Gloria is entitled to judgment for the recovery of $229,612.67, $289,922.57, $231,547.43, $269,634.88, $391,630.15 and $18,005.31, assessed against Plaintiff La Gloria Corporation as income tax for the fiscal years ended August 31, 1947, August 31, 1948, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively, and $17,098.29, $2,296.83, $3,876.31, $3,292.53, and $957.94, assessed against La Gloria as interest for the fiscal years ended August 31, 1947, August 31, 1949, August 31, 1950, August 31, 1951, and August 31, 1952, respectively, and, as such, collected from La Gloria by the defendants, together with interest thereon at the rate of 6% per annum from the dates of payment to respective defendants thereof.

10.
That judgment be entered in accordance with these findings and conclusions.